CHICAGO MAGNESIUM CASTING COMPANY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

(No. 59111; )

First District (1st Division)—September 3, 1974.

Chapman & Cutler, of Chicago (Stephen E. Kitchen and George P. Sullivan, of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (Dennis R. Fields, Richard W. Cosby, and Thomas J. Immel, Assistant Attorneys General, of counsel), for respondents.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

Chicago Magnesium Casting Company ("Chicago Magnesium") appeals from certain portions of an order of the Illinois Pollution Control Board finding that Chicago Magnesium had violated section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, § 1009 (a)) and imposing a $1000 fine. The case was submitted to the Board on an agreed statement of facts, which are summarized as follows:

Chicago Magnesium owns and operates a facility for the manufacture of castings, primarily of magnesium alloys. Among the manufacturing operations conducted is the pouring of molten magnesium alloys into molds. The manufacture of magnesium alloys often results in air-pollution emission problems during the pouring operations.

The standard operating practice in a sand foundry for magnesium-base alloys was to prepare the molten metal, to use sulphur dioxide gas or a

dusting of sulphur powder at the pouring station and finally to protect the molten metal in the mold by sulphur admixed with the sand. These various agents can be a source of atmospheric pollution.

On July 6, 1970, Steven Rosenthal and Maxim Rice, engineers of the Illinois Environmental Protection Agency ("Agency"), investigated a complaint of odors in the vicinity of Chicago Magnesium. At that time Mrs. William Kempfer complained of a "sulphurous, burning and rotten odor that could make one nauseous." Donald Burnett, president of Chicago Magnesium, claimed that about 1% of sulphur is in the sand used in the molds and that some of the sulphur can escape into the atmosphere during the pouring process. Chicago Magnesium was aware of the odor problem and had been working with the Cook County Air Pollution Control Bureau in an effort to control the sulphuric emissions. Chicago Magnesium had conducted air-sampling studies in the vicinity of the plant and had attempted "odor masking" to abate the odors. Burnett told the engineers he had been cooperating with the owner of a nearby mobile-home trailer court through an agreement to shut down operations when the odors became objectionable at the trailer court.

On January 24, 1972, Rosenthal and Timothy Antonoplos of the Agency again visited Chicago Magnesium. Calvin Trock, superintendant of manufacturing operations, told them that sulphurous odors do occur and are emitted during pouring operations. At that time the Agency investigators detected a strong smoky odor approximately 100 yards downwind of Chicago Magnesium. They also observed a haze coming from the west exhaust fan drifting toward the trailer court which was approximately 400 feet to the north. They interviewed several residents of the nearby trailer court who complained of strong odors. Some of them testified by stipulation that they noticed a "rotten choking odor coming from Chicago Magnesium"; that "the odor made them cough and sneeze and their eyes burn when downwind of the company"; that "they noticed acid-like fumes and a choking odor coming from Chicago Magnesium"; that "the odor came when the wind was from the south and hurt their chests"; that "they noticed an awful sickening odor when the wind was from the south"; and that "the odor made them sick to their stomachs."

In June, 1972, Burnett attended a seminar which was addressed by Dr. J. B. Hanawalt, professor of metallurgical engineering at the University of Michigan. Hanawalt described his ongoing research into the use of sulphur hexafluoride to replace the use of sulphur as an inhibitor for molten magnesium. The paper he submitted at the seminar described the purpose of his study to be the elimination of the necessity for the

sulphur agent in the sand. Later, Burnett personally discussed with Dr. Hanawalt the introduction of sulphur hexafluoride to replace sulphur in the production processes at Chicago Magnesium.

In July, 1972, Chicago Magnesium initiated the use of sulphur hexafluoride and abandoned the use of sulphur as an agent in its processes. In so doing, it became one of the first, if not the first, foundries in this country to use sulphur hexafluoride rather than sulphur as an agent. Since that date, Chicago Magnesium has not received any complaints from the owner or the residents of the nearby trailer court regarding odorous emissions. To introduce sulphur hexafluoride and replace sulphur as an agent has cost Chicago Magnesium approximately $3500.

Dr. Hanawalt had published two articles describing his research at the University of Michigan. The steps recommended by Dr. Hanawalt in the articles basically are those which have been implemented by Chicago Magnesium.

On December 1, 1972, the Agency filed a complaint against Chicago Magnesium alleging a violation of section 9(a). On February 6, 1973, Rosenthal again visited the Chicago Magnesium plant. He noted that sulphur emissions had been effectively abated. Upon inquiry, he received no complaints from the residents of the trailer court. In fact, they had no complaints as to the operations of Chicago Magnesium since July, 1972. Chicago Magnesium had begun filing the appropriate applications in order to obtain an operating permit for its facility in Blue Island. Those permit applications were presently being subjected to the Agency review procedures.

Donald Burnett testified by stipulation that before July, 1972, there was no economically reasonable nor technically feasible method for Chicago Magnesium to bring its emissions into compliance; and that prior to July, 1972, Chicago Magnesium had attempted to turn off its overhead exhaust fans in order to avoid spreading odors toward the trailer court when the wind was from a southerly direction.

Steven J. Rosenthal testified by stipulation that he had detected strong odors emanating from Chicago Magnesium during both his previous visits but that on February 6, 1973, the odors had been effectively abated; and that before utilization of sulphur hexafluoride there was no reasonable means for controlling sulphur dioxide emissions from magnesium foundries.

Chicago Magnesium affirmed its intention to continue the use of sulphur hexafluoride rather than sulphur. It stated that it would not abandon the use of sulphur hexafluoride nor reinstitute the use of sulphur as an agent without obtaining an appropriate operating permit from the Agency.

In its principal argument, Chicago Magnesium relies on section 33 of the Act (Ill. Rev. Stat. 1971, ch. 111½, § 1033), which provides in part:

"(c) In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source."

■■ The petitioner interprets section 33 to mean that, if it is not technically practicable or economically reasonable to reduce or eliminate the pollution, there can be no violation. Such an interpretation would mean that a government would be powerless to restrict pollution regardless of its severity, even if it endangered lives, so long as it was economically unreasonable or technically impracticable for an individual to continue to operate without polluting. This is a dangerous principle and manifestly unacceptable. We agree, rather, with the Agency's position that economic reasonableness and technical practicability are but two factors to be considered by the Board in determining whether or not the Act has been violated.

In support of its argument, Chicago Magnesium points to the decisions of the Board in four previous cases: Environmental Protection Agency v. Commonwealth Edison Co., PCB 70-4; Moody v. Flintkote Co., PCB 70-36, 71-67; Employees of Holmes Bros. v. Merlan, Inc., PCB 71-39; and Environmental Protection Agency v. Incinerator, Inc., PCB 71-69. In the last three cases the Board said in its written opinion that "air contaminant emissions are 'unreasonable' within the meaning of the Act when there is proof that there is an interference with life or property *and* that economically reasonable technology exists to control the contaminant emissions." (Emphasis added.)

At the outset, we note that in each case the Board found that there was an economically reasonable and technically feasible method available to control the emissions and an interference with life or property. Consequently, it found a violation in each case. But none of the cases

is authority for the reverse proposition—if a hardship is shown, ipso facto the polluter is absolved. In each case the Board passed only on the facts before it. We can only conjecture what the Board's position would have been if the polluters had been able to show economic hardship. The only assumption we can safely make is that the Board *might* have held in favor of the respondents in those cases.

Moreover, it is a recognized principle of statutory construction that a long-standing interpretation of a statute by the agency principally responsible for its enforcement may be entitled to great weight but the agency's interpretation is not necessarily binding on the court. (*C. O. Baptista Films v. Cummins*, 9 Ill.2d 259, 137 N.E.2d 393; *Mississippi River Fuel Corp. v. Illinois Commerce Com.*, 1 Ill.2d 509, 513-514, 116 N.E.2d 394.) Even if the Board's previous rulings could be considered as precedent for Chicago Magnesium's argument, and we do not believe they are, we would reject them.

The petitioner also cites *City of Monmouth v. Environmental Protection Agency*, 10 Ill.App.3d 823, 295 N.E.2d 136. In that case, the Board made a finding that it was technologically practicable to abate the pollution and imposed a fine. The appellate court reversed and remanded the case because the Board based its finding on evidence presented in another case and ignored the evidence presented by the City. Subsequent to oral argument in this case, the supreme court granted petitions for leave to appeal on behalf of both the City and the Agency. The supreme court agreed with the appellate court on the sufficiency of the evidence to support the finding of technological practicability but reversed and remanded the cause on other grounds. (*City of Monmouth v. Pollution Control Board*, 57 Ill.2d 482.) The court held: "It is plain that air pollution, as defined in the statute, was shown to exist, and the evidence supports the finding that the City was in violation of section 9(a)." (57 Ill.2d at 489.) The court, however, added:

> "The provisions of the Act make it plain that the General Assembly intended that the Board be possessed of expertise (ch. 111½, par. 1005(a)) and that it be vested with broad discretionary powers in making its orders and determinations (par. 1033 (c)) and in the imposition of civil penalties (par. 1042). It is equally plain that its orders and determinations are subject to judicial review (par. 1041), and in order to be sustained must find support in the record.
>
> The legislative declaration of the purpose of the Act (par. 1002) indicates that the principal reason for authorizing the imposition of civil penalties (par. 1042) was to provide a method to aid the enforcement of the Act and that the punitive considerations were

secondary. On this record, which shows beyond question that neither the Agency nor its predecessor, the Sanitary Water Board, was able to suggest an effective means of eliminating the odors, that the City, at substantial expense, co-operated in the implementation of every proposal, and that through the City's efforts the problem appears to have been solved, we hold that the Board erred in imposing the fine." 57 Ill.2d at 490.

■■ We believe the reasoning of the court in that case is applicable here. The evidence does show a violation of the Act even after the investigators had first visited the plant. As pointed out in the *City of Monmouth* case, once the proof has shown that the respondent has violated the Act, the burden is on the respondent to show that compliance with the Board's regulations would impose an arbitrary or unreasonable hardship. (Ill. Rev. Stat. 1971, ch. 111½, par. 1031(c).) Chicago Magnesium made an agreement with the residents of the trailer court to halt pouring operations while the wind was in the south. No evidence was submitted to show that the cessation of pouring operations or turning off the fans while the wind was from the south was economically unreasonable. That being so, the Agency could properly conclude that Chicago Magnesium had not sustained its burden of proof.

■■ The evidence does show a violation of the Act even after the investigators had first visited the plant. But no complaint was filed against Chicago Magnesium at that time. The record also shows that Chicago Magnesium had been working with the Cook County Air Pollution Control Bureau in an effort to control the emission. There is no gainsaying the fact that before July, 1972, there were no reasonable means for controlling sulphur dioxide emissions from magnesium foundries other than shutting off the fans or stopping the pouring operations. There was a 2½ year delay from the time of the first investigation of Chicago Magnesium until the complaint was filed. When the complaint was filed Chicago Magnesium was in compliance with the Act and had been so for almost 6 months. Under the circumstances, the imposition of a civil penalty will in no way aid the enforcement of the Act. For that reason we hold that the Board erred in imposing the fine. We, therefore, judge that the finding of the Board that Chicago Magnesium had violated section 9(a) is affirmed and that part of the order imposing a fine is vacated.

Order affirmed in part and vacated in part.

BURKE and GOLDBERG, JJ., concur.