HARRIS-HUB COMPANY, INC., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (4th Division)   No. 76-42

Opinion filed July 7, 1977.

Altheimer & Gray, of Chicago (Roger B. Harris, of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (Jeffrey S. Herden, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE LINN delivered the opinion of the court:

In an administrative proceeding brought by the Illinois Environmental Protection Agency (EPA) before the Illinois Pollution Control Board (PCB), Harris-Hub Company, Inc. (Harris), was assessed a civil penalty of $500 for its failure to obtain an operating permit. Ill. Rev. Stat. 1973, ch. 111½, par. 1009(b).

Harris appeals, contending the PCB erred in assessing a civil penalty where: (1) the EPA assessment of a penalty was not an aid in enforcement of the PCB Air Pollution Control Regulations; (2) the EPA failed to allow Harris an opportunity for voluntary compliance; and (3) the EPA failed to prove Harris was required to obtain an operating permit. As a separate procedural issue, Harris contends the PCB erred in refusing to allow Harris leave to file its written closing argument within a reasonable time.

We agree with the contentions of Harris and reverse the PCB decision.

Harris is a manufacturer of steel bed frames, rails and allied metal bedding products, and has been so engaged for the past twenty years. Each year, Harris uses in excess of 5,000 gallons of paint in connection with its manufacturing processes.

On November 7, 1974, a representative of the EPA inspected the Harris plant and the operations conducted there. The inspector reported that

Harris was "in compliance" with Rule 205(f) of the PCB Air Pollution Control Regulations governing emission of organic or photochemically reactive material discharged from paints and solvents. The inspector further noted that there was no odor emanating from the Harris plant and except for not having obtained a permit from EPA, Harris was in compliance with the rules and regulations regarding air pollution control.

On November 12, 1974, the EPA wrote Harris, stating in part as follows:

" * * * investigation revealed the following circumstances which may constitute violations of the Environmental Protection Act and related Regulations:

Rule 103(b)(2)—Failure to apply for operating permits."

The letter enclosed certain permit application forms and requested Harris to advise of its intentions to comply with Rule 103. Thereafter, Harris asserts that it contacted the inspector regarding the complexity of the permit application forms and was advised that the EPA offered a two-day seminar on how to complete the forms.

On February 4, 1975, Harris wrote the EPA and submitted a "letter-application" for a permit and stated that it did not have the technical ability to complete the forms fully. On March 3, 1975, the EPA wrote Harris that the February 4 "letter-application" was not acceptable since it lacked the required information and "it is the desire of the EPA to assist you in preparing an acceptable permit application." The EPA letter did not indicate that enforcement proceedings would be instituted unless Harris immediately submitted a revised permit application form. In early March 1975, Harris contacted and later retained an engineering firm to process and complete the permit application form consisting of 76 pages.

On April 2, 1975, without prior notice to Harris, the EPA complaint seeking a civil penalty sanction for failure to have an operating permit was filed by the EPA and on April 7, 1975, Harris was served by certified mail. The permit application form was completed and submitted to the EPA on April 18, 1975. After additional items of information were submitted pursuant to the EPA request, on June 19, 1975, the EPA issued Harris an operating permit.

Initially, Harris contends that its dealings with the EPA in resolving the problem of its acquiring the operating permit have been conducted in good faith. Harris points out that its actions have always indicated a sensitivity to and a concern for environmental matters. Long before the filing of the complaint by the EPA, Harris, in order to reduce polluting emissions, had changed its plant's heating system from coal to oil and then from oil to gas, even though a gas operation was more expensive. Additionally, Harris installed an afterburner on its incinerator to control smoke emissions, and when that did not achieve complete elimination of

emissions it stopped burning refuse entirely. Also, to reduce emissions further, Harris embarked on a program to convert all of its forklift trucks from gas to electric power and to similarly convert its diesel-powered truck tractors. Accordingly, Harris maintains that since it has acted in good faith throughout and has not been a polluter, no penalty should be imposed since the imposition of a penalty would not aid in the enforcement of the Environmental Protection Act. (Ill. Rev. Stat. 1973, ch. 111½, par. 1002(b); *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161.) We agree.

■■ Imposition of penalties under the Environmental Protection Act is not to be invoked for punishment but to aid enforcement of the Act. (*Metropolitan Sanitary District v. Pollution Control Board* (1975), 62 Ill. 2d 38, 338 N.E.2d 392; *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406; *May v. Pollution Control Board* (1976), 35 Ill. App. 3d 930, 342 N.E.2d 784; *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161; *CPC International, Inc. v. Pollution Control Board* (1974) 24 Ill. App. 3d 203, 321 N.E.2d 58.) Also, violation of a provision of the Act does not, in and of itself, necessarily warrant the sanction of a fine. In fact, it must be shown that the imposition of a fine in the particular case would aid in enforcement of the Act. In *Southern Illinois Asphalt Co.*, the supreme court, in reversing the PCB imposition of a penalty for the respondent firm's failure to obtain a permit, stated:

"Obviously the General Assembly did not intend that the Pollution Control Board should impose a monetary fine in every case of a violation of the Act of regulations.* * *

Arguably, the imposition of a civil penalty for each violation may deter further violations by the one penalized or by others, thus aiding in the administration of the Act. However, the Pollution Control Board itself has recognized that the arbitrary imposition of penalties can in fact hinder the fulfillment of the purpose of the Act.* * *

* * *

The failure to obtain the permit was pure inadvertence. There was no need to assess a penalty in aid of the enforcement of the Act because Southern had ceased operating prior to the filing of the complaint. The fine could not be imposed as a penalty for any consequences of polluting the air since Southern had not been charged with air pollution. The fine was an arbitrary penalty and further unjustified in view of the mitigating circumstances shown by the evidence." (60 Ill. 2d 204, 208-10, 326 N.E.2d 406, 408, 409.)

To the same effect, see *Bresler Ice Cream Co. v. Pollution Control Board*

(1974), 21 Ill. App. 3d 560, 315 N.E.2d 619, and *Chicago Magnesium Casting Co. v. Pollution Control Board* (1974), 22 Ill. App. 3d 489, 317 N.E.2d 689, holding that the mere fact that the respondent firms in those cases had been in violation of provisions of the Act was not alone sufficient to permit imposition of penalties.

Furthermore, good faith is a mitigating factor as evidenced by the PCB's own decision in *Employees of Holmes Bros. v. Merlan, Inc.* (1971), 2 Ill. P.C.B. Op. 405, 409, where it stated:

"In the opinion of the Board, Merlan has exercised good faith in trying to control its problems, and to penalize a company such as this would discourage all those who act in good faith to bring an end to their pollution problems."

■■ In this case the record shows no basis for assessing a penalty other than the fact that Harris had not obtained a permit. Considering the totality of the conduct of Harris, we cannot say that the imposition of a fine in this case would materially aid in the enforcement of the Act. In fact, the evidence also discloses that Harris was under the good faith belief, even if erroneous, that it was not required to obtain a permit. Under the facts presented, we believe any inadvertence attributable to Harris may be excused. See *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406.

A careful reading of the trial testimony tends to indicate the belief by certain of the EPA witnesses that Harris was a recalcitrant respondent, deliberately attempting to avoid compliance with the Act. The record fails to support that belief. The balance between maintaining an important principle and pursuing practical accomplishment is often difficult to discern. Here, however, it is apparent that the resources of the EPA and the PCB would have been better served by obtaining compliance by polluters rather than by seeking the sanction of a civil penalty for a technical noncompliance by Harris.

While we are aware of the heavy responsibility carried by the EPA in its duty to implement and enforce the Act, we also are mindful that our supreme court has held that the principal reason for imposing a civil penalty is to provide a method to aid the enforcement of the Act, and that punitive considerations are secondary. *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161; Marshall, *Environmental Protection and the Role of the Civil Money Penalty: Some Practical and Legal Considerations*, 4 Environmental Affairs 323 (1975).

To bolster its position that the penalty imposed by the PCB was necessary to aid the enforcement of the Act, the EPA points out that the penalty is a means of the EPA recovering its costs, necessarily incurred, in securing compliance, including the costs of governmental prosecution. *(Helvering v. Mitchell* (1938), 303 U.S. 391, 82 L. Ed. 917, 58 S. Ct. 630;

*City of Waukegan v. Pollution Control Board* (1974), 57 Ill. 2d 170, 311 N.E.2d 146.) Also, the EPA argues that imposing a penalty removes the economic incentive that would otherwise exist for industry to avoid or delay compliance as long as possible. (*Aluminum Coil Anodizing Corp. v. Pollution Control Board* (1976), 40 Ill. App. 3d 785, 351 N.E.2d 612.) However, in this case, Harris was not a polluter or a source of unpermitted emissions. The compliance sought was to have Harris obtain a permit and Harris was well along the road in so doing. In fact, the record discloses that the evidentiary hearing before the PCB began on June 20, 1975, one day after the EPA had issued its permit to Harris. Additionally, the record fails to disclose that Harris was gaining any economic advantage over its business competitors, considering the expense incurred in controlling possible pollution in its manufacturing procedures.

Harris next urges that it was lulled into the belief that it was in compliance since no "Official Legal Notice" was ever sent to it. The record discloses that on October 23, 1974, prior to the inspection of the Harris plant, the EPA adopted the procedure of sending an "Official Legal Notice" to potential respondent firms who were required to, but had not secured, an operating permit. The notice alerted the potential respondent of his duty to obtain the permit and sought voluntary compliance in order to avoid legal proceedings. Upon the prompt response of the potential respondent to the effect that immediate action would be taken to obtain a permit, the EPA would "defer" and "adjust the priority of filing proceedings to a low level."

Despite extensive cross-examination of the EPA representative, he was unable to state any conscious decision by the EPA not to send Harris the notice. Further, the EPA was unaware of any other "permit only" cases where such a notice was not sent.

The EPA does not dispute that it is bound to follow its own procedures and practices. (*Morton v. Ruiz* (1974), 415 U.S. 199, 39 L. Ed. 2d 270, 94 S. Ct. 1055; *Service v. Dulles* (1957), 354 U.S. 363, 1 L. Ed. 2d 1403, 77 S. Ct. 1152.) This principle is applicable to rules, practices, procedures and interpretations by administrative agencies. (See *Scheffki v. Board of Fire & Police Commissioners* (1974), 23 Ill. App. 3d 971, 320 N.E.2d 371; *Margolin v. Public Mutual Fire Insurance Co.* (1972), 4 Ill. App. 3d 661, 281 N.E.2d 728.) Nevertheless, the EPA takes the position that the warning letter or "Official Legal Notice" sent by the EPA is a gratuitous gesture and that the Act does not require that a potential respondent be put on notice prior to suit being instituted. Furthermore, the EPA asserts that Harris was already notified that it required a permit and that the additional "Official Legal Notice" was unnecessary.

■■ The EPA points to the case of *Aluminum Coil Anodizing Corp. v.*

*Pollution Control Board* (1976), 40 Ill. App. 3d 785, 351 N.E.2d 612, where it was held that notice of a violation is not necessary in order to find a violation or impose a fine. We believe the *Aluminum Coil* case is distinguishable. There, *Aluminum Coil* was emitting dangerously harmful chemical pollutants with serious consequences to people and property in the vicinity of its plant. Additionally, the emissions continued for over a year after suit was filed despite the fact that pollution technology was available to control the emissions. It was, indeed, a case of deliberate and willful violation of the pollution laws. This is hardly the situation in the case of Harris. We also conclude that it was inappropriate for the EPA to have failed to follow its own established procedure by omitting to send Harris an "Official Legal Notice."

Several additional assertions of Harris are presented for our consideration. Harris argues that no penalty sanction could be invoked where there was no proof in the record that Harris was a polluter. Further, Harris maintains it was prejudicial for the PCB to deny Harris a reasonable time to file its written closing argument. However, in view of the conclusion reached by us as to the disposition of this case, there is no need to comment on those points. See *Griffin v. Rausa* (1954), 2 Ill. 2d 421, 118 N.E.2d 249.

Finally, we note that reviewing courts are compelled to uphold factual determinations of administrative agencies as correct unless the determinations are contrary to the manifest weight of the evidence. (*Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill. 2d 290, 319 N.E.2d 794; *May v. Pollution Control Board* (1976), 35 Ill. App. 3d 930, 342 N.E.2d 784; *Rhodes v. Pollution Control Board* (1972), 8 Ill. App. 3d 74, 289 N.E.2d 61.) Here, the record discloses that Harris has met this burden.

In view of the foregoing, we reverse the PCB decision imposing a civil penalty and remand this case to the PCB with directions to dismiss the administrative proceedings against Harris.

Reversed and remanded with directions.

DIERINGER, P. J., and ROMITI, J., concur.