PARK CREMATORY, INC., Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

First District (1st Division)   No. 1—92—2729

Opinion filed June 20, 1994.

Cosby & Bell, of Chicago (Richard W. Cosby, of counsel), for petitioner.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of counsel), for respondents.

JUSTICE BUCKLEY delivered the opinion of the court:
This appeal arises out of an action originally brought by the

Environmental Protection Agency (Agency) before the Pollution Control Board (Board) against Park Crematory, Inc. (Park), alleging several violations of the Illinois Environmental Protection Act (Act) (415 ILCS 5/1 *et seq.* (West 1992)). After an administrative hearing, the Board determined that Park committed several of the alleged violations and imposed a fine of $9,000. Pursuant to Supreme Court Rule 335 (134 Ill. 2d R. 335), Park filed a petition for direct review in the appellate court. Park contends on appeal that the $9,000 fine imposed by the Board is excessive in light of the fact that Park was not alleged to have caused any actual pollution and had corrected all permit violations almost 10 months before the original complaint was filed with the Board.

Park is a crematory facility which engages in the disposal of human remains by cremation. When Park was incorporated by its owner, Gerald Sullivan (Park's owner), in 1979, it had only one incinerator unit. A second incinerator unit was installed in 1982. Both units consist of a primary and a secondary combustion chamber which are connected to a single stack which is located at the rear of the building which houses the Lain Sullivan Funeral Home.

In 1982, prior to the installation of the second incinerator, the Agency conducted its first inspection of the Park facilities. According to the inspection report, Park did not have an operating permit for its one incinerator and had not yet applied for a construction permit for its planned installation of a second incinerator. In the report, however, the Agency inspector wrote that "[Park's owner] indicated that he would be happy to fill out the permit forms" and the inspector recommended that a warning letter be sent with the appropriate forms. On February 17, 1982, the Agency sent Park the necessary application forms and a warning letter outlining the permit violations. On March 1, 1982, Park's owner sent a letter to the Agency in which he stated that he would return the permit forms "back to you as soon as we have gathered the needed information." On July 29, 1982, the Agency sent another warning letter to Park and requested that it submit within 15 days its intention to comply with the operating permit requirements. The Agency subsequently received an operating permit application from Park for one incinerator unit, model number JN-1-GA. Park did not submit a construction permit application for the second unit. On September 23, 1982, the Agency issued an operating permit to Park for the one incinerator. The parties dispute as to which unit the operating permit applied.

The operating permit required that Park keep a maintenance record for each item of air pollution control equipment and that this record be available for inspection at any time during normal working

and/or operating hours. The permit further required that "[t]he secondary combustion chamber must be preheated to the incinerator manufacturer's recommended operating temperatures before any waste is loaded into the unit." Park's owner testified that Park followed the manufacturer's loading instructions. He stated, however, that the instructions Park received from the manufacturer did not specify a recommended operating temperature, but rather recommended that the primary chamber not be loaded until the bricks in the secondary chamber were "cherry red." He also testified that he never allowed the incinerators to be operated when they needed maintenance.

Mel Villalobos, an environmental specialist with the Agency, conducted a second routine inspection of the Park facilities in October 1990. He visually inspected the stack emissions and did not notice any smoke or odors. In his report, however, Villalobos noted that one of the two incinerator units was not covered by an operating permit, the units did not have temperature gauges, and no maintenance log was made available to him during his inspection.

Following Villalobos' inspection, on October 22, 1990, the Agency sent Park a letter noting the following apparent violations: (1) failure to install temperature gauges on the incinerator units; (2) failure to keep a maintenance log of the incinerator units; (3) failure to obtain an operating permit for one of the incinerator units; and (4) failure to obtain a construction permit for the second incinerator unit. In the letter, the Agency requested that, within 15 days, Park submit in writing "the reason(s) for the apparent violations *** as well as the description of the steps which have been initiated to prevent any further recurrence of the *** violations."

On October 29, 1990, Park submitted an operating permit application for the second incinerator. On November 7, 1990, Park's owner notified the Agency that temperature gauges would be installed no later than December 1, 1990, that a maintenance log had been established and that all permit applications had been completed. By December, the temperature gauges had been installed and, on December 12, 1990, the Agency issued Park an operating permit for the second incinerator unit.

Notwithstanding the fact that Park had responded to the October 22 compliance inquiry and had corrected the apparent violations, the Agency sent Park an enforcement notice letter (415 ILCS 5/31(d) (West 1992)) on January 2, 1991, setting forth the violations and notifying Park that the matter had been referred to the Illinois Attorney General's office for enforcement.

On October 9, 1991, the Attorney General, on behalf of the People of the State of Illinois, filed a complaint with the Board alleging the previously stated violations. The Attorney General requested that the Board assess the maximum penalties allowed under the Act. Specifically, the Attorney General prayed that the Board assess a civil penalty against Park of $50,000 for each violation of the Act, an additional civil penalty of $1,000 for each day during which each violation continued prior to July 1, 1990, and an additional civil penalty of $10,000 for each day of each violation after July 1, 1990. 415 ILCS 5/42(a) (West 1992).[1]

Following the administrative hearing the Board found that Park violated the Act by operating its second incinerator from 1982 through 1991 without an operating permit, by constructing its second incinerator without a construction permit, and by failing to furnish its maintenance records to Villalobos during his inspection. The Board found no violation in Park's failure to install temperature gauges. Noting that the maximum penalty could be "substantial," the Board assessed a penalty against Park of $9,000, which represented "a fine of $1,000 per year of violation." Park then filed a timely petition for direct review of the Board's decision in this court.

Park concedes that it committed the violations of the Act for which it was assessed a $9,000 fine. Additionally, the Attorney General does not contest the fact that this case does not involve any allegations of actual environmental pollution. There is no evidence that Park's incinerators are operated any less than according to the highest standards or that they have caused any pollution. Park phrases its contention on appeal as follows: "The Illinois Pollution Control Board is without authority to impose a $9,000 fine upon a non-polluter which has voluntarily acted to correct all technical permit violations even before the section 31(d) Letter was sent." The argument Park presents in its brief, however, does not truly challenge the Board's authority to assess a civil penalty for the violations Park committed. In fact, the Act clearly authorizes the Board to assess civil penalties for any violation of the Act's

---

[1]Prior to July 1, 1990, the Act provided that any person found to be in violation of the Act would be liable for a civil penalty not to exceed $10,000 for each violation and an additional penalty not to exceed $1,000 for each day during which the violation continued. (Ill. Rev. Stat. 1989, ch. 111$^{1}$/$_{2}$, par. 1042 (now 415 ILCS 5/42 (West 1992)).) The Act was amended, effective July 1, 1990, however, to provide that a violator would be liable for a civil penalty not to exceed $50,000 for each violation and an additional penalty not to exceed $10,000 for each day during which the violation continued. Ill. Rev. Stat. 1991, ch. 111$^{1}$/$_{2}$, par. 1042 (now 415 ILCS 5/42 (West 1992)).

requirements regardless of whether those violations resulted in actual pollution. (415 ILCS 5/8 *et seq.* (West 1992).) In effect, the substance of Park's argument is that the $9,000 fine imposed against it is excessive in light of legal precedent and, therefore, the Board's order is against the manifest weight of the evidence. Park maintains that only egregious violations of substantive pollution standards and permit regulations justify substantial fines. According to Park, good-faith attempts at compliance with Board requirements justify the abatement of a monetary penalty. Park asserts, therefore, that, under the facts of this case, no monetary fine should have been imposed and asks that we vacate the $9,000 penalty imposed by the Board.

■ We first note that the Act provides for both civil and criminal penalties. (415 ILCS 5/42, 44 (West 1992).) In *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 207, 326 N.E.2d 406, 408, the Illinois Supreme Court explained that the criminal penalty was "obviously intended to be punitive," and that the provision allowing for civil penalties "was to provide a method to aid the enforcement of the Act and that the punitive considerations were secondary." Therefore, a violation of the Act does not warrant the imposition of a civil fine unless such a fine would aid in the enforcement of the Act. (*Harris-Hub Co. v. Pollution Control Board* (1977), 50 Ill. App. 3d 608, 611, 365 N.E.2d 1071, 1073.) "Where cooperation has been shown, compliance with the Act has already come about, and the imposition of a civil penalty would in no way aid the enforcement of the Act, it has been held that a fine is improper." *High Lake Poultry, Inc. v. Pollution Control Board* (1975), 25 Ill. App. 3d 956, 960, 323 N.E.2d 612, 615; see *Bresler Ice Cream Co. v. Pollution Control Board* (1974), 21 Ill. App. 3d 560, 563, 315 N.E.2d 619, 622; *Chicago Magnesium Casting Co. v. Pollution Control Board* (1974), 22 Ill. App. 3d 489, 495, 317 N.E.2d 689, 694; *CPC International, Inc. v. Pollution Control Board* (1974), 24 Ill. App. 3d 203, 208, 321 N.E.2d 58, 61.

On review, we give deference to administrative determinations and will not intervene unless the order is against the manifest weight of the evidence or the Board abused its discretion by acting "arbitrarily or capriciously." (*Southern Illinois Asphalt*, 60 Ill. 2d at 207, 326 N.E.2d at 408.) The record, however, must demonstrate an adequate rationale for the imposition of the fine (*Bresler Ice Cream*, 21 Ill. App. 3d at 563, 315 N.E.2d at 622) and the fine must be "commensurate with the seriousness of the infraction." *Trilla Steel Drum Corp. v. Pollution Control Board* (1989), 180 Ill. App. 3d 1010, 1013, 536 N.E.2d 788, 790.

■ Effective July 1, 1990, a violation of any provision of the Act

subjects a violator "to a civil penalty of not to exceed $50,000 for the violation and an additional civil penalty of not to exceed $10,000 for each day during which the violation continues." (415 ILCS 5/42(a) (West 1992).)[2] Pursuant to section 33 of the Act, when making its determinations and orders, the Board must:

"(c) *** take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved;

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source; and

(v) any subsequent compliance." (415 ILCS 5/33(c) (West 1992).) *(Southern Illinois Asphalt*, 60 Ill. 2d at 207-08, 326 N.E.2d at 408.) Additionally, when determining an appropriate civil penalty, the Board should consider evidence in mitigation and aggravation, including but not limited to:

"(1) the duration and gravity of the violation;

(2) the presence or absence of due diligence on the part of the violator in attempting to comply with requirements of this Act and regulations thereunder or to secure relief therefrom as provided by this Act;

(3) any economic benefits accrued by the violator because of delay in compliance with requirements;

(4) the amount of monetary penalty which will serve to deter further violations by the violator and to otherwise aid in enhancing voluntary compliance with this Act by the violator and other persons similarly subject to the Act; and

(5) the number, proximity in time, and gravity of previously adjudicated violations of this Act by the violator." 415 ILCS 5/42(h) (West 1992).

■ In this case, the Board stated that a "crucial point" in its assessment of the fine was its consideration of the first statutory factor listed in section 33 of the Act. (415 ILCS 5/33(c) (West 1992).) The Board reasoned that the permit requirements were designed to regulate possible pollution sources. The Board stated:

[2]See note 1.

"The only way such a system can operate effectively is for the Agency to be aware of all sources and to permit accordingly. \*\*\* If the Agency is unable to ascertain the location and output of pollution sources, it would be impossible to regulate those sources towards the goals mandated under the Clean Air Act. The ultimate effect is detrimental to the 'health, general welfare and physical property of the People.' "

In support of this reasoning, the State asserts that this court's decision in *Standard Scrap Metal Co. v. Pollution Control Board* (1986), 142 Ill. App. 3d 655, 491 N.E.2d 1251, is "instructive." The State contends that Park's failure to comply with the permit requirements was not a mere "paper" or "minor" violation and cites the following language from the *Standard Scrap* case:

"[T]he violation of a permit requirement goes directly to the heart of the State's enforcement program and ability to protect against environmental damage. The permit program is a method through which the State of Illinois can control emitters of contaminants into the atmosphere, as well as emissions that may result in the presence of contaminants in the environment." (*Standard Scrap*, 142 Ill. App. 3d at 662, 491 N.E.2d at 1256.)

The State argues that, as in *Standard Scrap*, we should not sanction Park's assertion that its violation was "minor."

The problem with this rationale is that it is not justified by the facts of this case. Standard Scrap showed a continuing lack of good faith and, over a period of 10 years, "demonstrated a blatant disregard for the requirements and procedures designed to protect the environment." (*Standard Scrap*, 142 Ill. App. 3d at 662, 491 N.E.2d at 1255.) In fact, at the time of our decision, Standard Scrap had yet to bring its facility into compliance. Additionally, there was evidence that Standard Scrap gained considerable economic benefit from failing to comply with the Act. Moreover, testimony showed that the smoke from the Standard Scrap plant was so thick that it created a safety hazard for drivers on the Dan Ryan Expressway and caused workers at a neighboring company to become ill.

The facts of this case show that Park is not a polluter, that Park realized almost no economic advantage from its noncompliance, and that Park's owner acted in good faith. Most importantly, Park was not beyond the regulatory awareness of the Agency. The inspections the Agency conducted in 1982 and in 1990 show that it was aware of Park's existence. Park had an operating permit for one of its incinerator units and thereby "became a part of the regulatory program of the Agency and the Agency had data concerning the company's existence \*\*\* and the contaminants which were emitted by the operation." (*Trilla Steel*, 180 Ill. App. 3d at 1013, 536 N.E.2d at

790.) The ultimate penalty should take this into account since the penalty imposed must be commensurate with the impediment the company poses to the effective implementation of the Act. (*Trilla Steel*, 180 Ill. App. 3d at 1014, 536 N.E.2d at 791.) In our opinion, therefore, "[t]he board has not shown that [Park's] omission has harmed in a serious manner either the information gathering or oversight roles of the Agency." See *Trilla Steel*, 180 Ill. App. 3d at 1013, 536 N.E.2d at 790 (fine of $10,000 was excessive because Trilla Steel was not a polluter and previously had an operating permit; therefore, the company was part of the regulatory program of the Agency and its failure to renew its permit did not create a harmful impediment to the Agency's responsibility to protect the environment or the public); *Modine Manufacturing Co. v. Pollution Control Board* (1990), 193 Ill. App. 3d 643, 649, 549 N.E.2d 1379, 1383 (adopting reasoning of *Trilla Steel*).

As to the remaining section 33 factors, the Board found that there was no indication that Park was a polluter or had any problems with emissions, that Park had operated for 13 years without complaints, that Park was of social and economic value, and that Park had come into full compliance with the Act's requirements by December 12, 1990.

The Board also determined that the actions of Park's owner and his prompt cooperation with the Agency after being notified of the problems demonstrated that the violations were not "wilful, knowing or repeated." The Board considered as relevant to this conclusion the fact that "[w]hile [Park's owner] was aware of the permitting process, the record indicates that he may not have fully understood the permitting requirements and procedures."

In determining the appropriate fine the Board also considered the mitigating and aggravating factors listed in section 42(h) of the Act. (415 ILCS 5/42(h) (West 1992).) The Board found that Park had operated without a permit from 1982 through 1990. The Board noted, however, that there was no evidence of previously adjudicated violations against Park and that Park cooperated fully with the Agency during the investigation. It also concluded that any economic benefits received by Park as a result of its delay in compliance were "minimal" and probably limited to costs associated with the permit application and renewal fees. The Board then assessed a penalty of $9,000 which, it asserted, "amounts to $1,000 per year of violation." It held that "[t]his penalty is necessary to aid in the enforcement of the permit violations."

After reviewing the facts of this cause in light of the abovestated statutory considerations and the relevant case law, we believe that

the Board erred in imposing such a substantial penalty in this case. In fact, it is clear that a penalty under these facts is inappropriate. We, therefore, vacate the $9,000 penalty assessed against Park.

The evidence shows that, at all times, Park's owner acted in "good faith." (See *Harris-Hub*, 50 Ill. App. 3d at 612, 365 N.E.2d at 1074 (good faith is a factor to be considered in mitigation).) The Board concluded that the violations were not "wilful, knowing or repeated" and were probably due to the fact that Park's owner did not "fully understand the permitting requirements and procedures." Additionally, Park's owner was extremely cooperative and, upon being notified of the violations, acted promptly to correct them. In fact, Park was in full compliance with the Act prior to even being notified that the matter had been referred to the Attorney General for enforcement and at least 11 months before the complaint was filed with the Board.

Park's owner's apparent misunderstanding of the permit requirements, his prompt cooperation with the Agency and the fact that the violations were corrected prior to the filing of the complaint show that the imposition of a penalty in this case would in no way aid in the enforcement of the Act. Additionally, as the Board itself has reasoned in a previous case, to penalize those who act in good faith would serve only to discourage others who act in good faith from moving to correct their violations. (*Harris-Hub*, 50 Ill. App. 3d at 612, 365 N.E.2d at 1074, citing *Employees of Holmes Brothers v. Merlan, Inc.* (1971), 2 Ill. P.C.B. op. 405, 409.) Moreover, Park was not alleged to be a polluter, gained no noticeable economic advantage from its failure to comply with the permit requirements and was not "beyond the regulatory awareness of the Board." Therefore, under the facts and circumstances of this case, a fine would not be "commensurate with the seriousness of the infraction."

In our opinion, a complaint should never have been filed against Park with the Board. The purpose of the Act is to maintain the purity of the air in order to protect the health and welfare of the people of the State. (415 ILCS 5/8 (West 1992).) The provision providing for civil penalties for violations of the Act is merely a sword for the Agency to wield in its battle to enforce the Act's requirements. In this case, there was no need for that sword to be unsheathed. When the violations were first discovered, the Agency notified Park. The Agency requested that Park promptly notify the Agency of the reasons for the violations and that it promptly correct them. As it turns out, this was both an effective and appropriate course of action. Park responded to the Agency letter and promptly instituted corrective action. In fact, the evidence shows that Park was in full

compliance with the Act's requirements before the matter was even referred to the Attorney General for enforcement and at least 11 months before a complaint was filed. Thus, the Agency had succeeded in its purpose and assured compliance with the Act. There was no need for further action. Consequently, the imposition of a fine in this case is unjust, inequitable and would be "purely punitive."

Accordingly, for the foregoing reasons, we affirm the Board's finding that Park violated certain provisions of the Act, but vacate the Board's assessment of a $9,000 civil penalty.

Affirmed in part and vacated in part.

O'CONNOR and MANNING, JJ., concur.