MARBLEHEAD LIME COMPANY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (3rd Division)    No. 61476

---

Opinion filed September 7, 1976.

O'Keefe, Ashenden, O'Brien, Hanson & Lyons, of Chicago (John F. Ward, Jr., of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (Larry B. Blackwood, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

This is a petition for review of an order of the Illinois Pollution Control Board (hereinafter the Board) directing petitioner, Marblehead Lime Company, to cease and desist from violation of section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1009(a)), and imposing a fine of $20,000 for past violations.

Petitioner owns and operates a lime manufacturing plant located at 3245 East 103rd Street in the City of Chicago. The main process employed at the plant is the calcination of raw limestone (calcium carbonate) in rotary kilns. The end product of the kiln operation is lime and waste products including exhaust gas, limestone, lime, and ash. The gaseous waste product passes from the kiln into a pollution control installation known as a baghouse. There, the gas passes through bags in a process designed to trap dust and particulate matter. The gas and any waste product that is not trapped by the bags is then emitted through stacks into the atmosphere. A baghouse theoretically should operate at an efficiency of 99.50% in collecting dust generated from the kiln.

When petitioner began producing lime at its site in 1926, the entire area was zoned for heavy industrial uses. In the late 1950's, the area directly east of petitioner was rezoned residential and in the early 1960's homes were built on that land. In 1964 petitioner became the first company to install a baghouse pollution control device on a lime kiln. In 1967 petitioner entered into an emission reduction program with the City of Chicago which resulted in installation of baghouses in each of petitioner's four kilns. Petitioner also installed an access road to permit trucks to enter and leave the plant without traveling through the residential area. The capital expenditures for the improvements amounted to $2,163,500.

On May 23, 1973, the Environmental Protection Agency (hereinafter the Agency) commenced these proceedings by filing a complaint with the Board. The complaint charged that petitioner, through the maintenance of open stockpiles and operation of certain equipment and facilities, caused or allowed the discharge of particulate matter into the atmosphere. Said discharge, the complaint recited, caused air pollution, either alone or in combination with other contaminants, in violation of section 9(a) of the Environmental Protection Act. A second count charged petitioner with emissions of particulate matter from open stockpiles in violation of Rule 9(f)(2) of the Air Pollution Control Regulations.

At the conclusion of eight days of hearings, and after receiving memoranda from the parties, the Board dismissed Count II for lack of evidence. The Board, however, in written findings held that petitioner

had violated section 9(a), ordered it to cease and desist from further violations by adopting a specific program for improved pollution control, and imposed the aforementioned fine. Petitioner's motion to vacate the order was denied and this petition for review was filed.

Section 9(a) of the Environmental Protection Act provides:

"No person shall: (a) Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations on standards adopted by the Board under this Act; * * *."

The term "air pollution" is defined in section 3(b) as "the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to property, or to unreasonably interfere with the enjoyment of life or property." Ill. Rev. Stat. 1973, ch. 111½, par. 1003(b).

Petitioner first contends that the Agency failed to prove that its emissions, either alone or in combination with others caused "air pollution" as defined in the Act. Petitioner maintains that the Agency produced no evidence as to the quantities, characteristics, or duration of its emissions and further contends that the Agency failed to prove a causal connection between its emissions and the alleged injury.

At the hearing, the Agency introduced the testimony of 33 persons who reside in the area adjacent to petitioner's plant. These witnesses all testified that their property is subject to a continuous fallout of dust from petitioner's plant. The witnesses specified the source of the dust, stating that it came from petitioner's baghouses, stacks, buildings, conveyor system, and trucks.

Some witnesses stated that the emissions were particularly bad on windy days while others found the dust most bothersome during nighttime hours. The particles were generally described as white or gray, although some witnesses noticed black dust. In texture the dust was termed chalk-like, powdery, sandy or gritty. One witness testified that the dust tasted like lime while others described a chalky dry taste.

As to the quantity of the contaminant, the witnesses agreed that the dust emanating from petitioner's plant covered their home, lawn, garages, patios and inside furniture. They complained of dust on automobiles, in clothing and bed linens, and in swimming pools. Freshly painted homes were soon covered with white powder. Food served outside became covered with the dust, and windows and furnishings required constant cleaning. On windy days, residents found the dust comparable to fog or snow. Several witnesses testified that normal outdoor activities had been curtailed or eliminated because of the dust problem. One woman stated

that, after a rain, the dust particles became like cement and took hours to remove. Several witnesses stated that because of the dust their children refused to play outdoors on windy days.

Witnesses also testified that dust particles in the atmosphere had an adverse effect on their health. They described skin, eye, and throat irritations, and attributed these problems to the dust. Two witnesses had trouble breathing when the wind blew toward them. While the dust did not affect some witnesses, other said their children complained of burning eyes and throat pains.

In response to residents' complaints, an engineer for the Agency, Laxmi Kesari, made seven visits to the area. He testified that he observed dust covering the window sills, staircases, front porches and lawns of homes in the area. He observed white dust blowing from petitioner's plant and, on four occasions, particularly noted dust emanating from baghouses #3 and 4. Kesari was present in the area on July 12, 1973, and compared the dust, on that day, to a sandstorm. His eyes became extremely irritated.

On July 25, 1973, Kesari visited the plant for a pre-arranged meeting with petitioner's personnel. Although baghouses #1 and 2 were in good condition, Kesari observed many leaking areas in baghouse #3, particularly around the duct-work, the hopper and the upper portions of the installation. He inspected two compartments in the baghouse and observed that seven bags were broken but not in use. There was a 12-inch accumulation of dust on the baghouse floor, and dust blew through cracks in the siding of the installation. According to Kesari, respondent's plant manager told him that emissions from baghouses 3 and 4 were due to leakage; that maintenance was a problem; and that plans were underway to reduce emissions from baghouse #3. Another employee told Kesari that a broken bag is not detected until emissions are seen coming from the stack. The employee also informed Kesari that bags broken at night receive no attention until morning.

Kesari further testified that during the July 25 visit, he observed dust blowing off conveyor belts and piles of lime dust on top of the storage silos. Deposits of dust on grated floors fell through the floors and blew into the atmosphere through openings in the building. In Kesari's opinion, these emission sources could be eliminated with improved housekeeping or minor structural corrections. Kesari testified that a large quantity of lime dust emanated from the truck loading area and from loaded trucks traveling in excess of 15 miles per hour. It was his opinion that an enclosed loading zone and a 5-mile-per-hour speed limit would significantly curb emissions from these sources. On cross-examination Kesari stated that he had no prior experience in the maintenance of a lime process baghouse.

Ed Norton, petitioner's plant manager, testified that his comment to Kesari had not been as Kesari testified. He recalled stating that baghouses,

by nature, pose constant maintenance problems. In Norton's opinion, the air pollution devices at petitioner's plant are "state of the art" and enclosure of the loading zone is impractical. With regard to baghouse maintenance, Norton stated that broken bags are capped off and dust is allowed to accumulate in the building. When a certain number of bags are damaged, the kiln is shut down and all the repairs are completed. Norton believed that neither dust accumulation, broken bags, nor missing siding affect the efficiency of the baghouse. He conceded that residual dust is carried through the stack when the compartment door is open, but stated that safety rules require the door to remain open during inspection.

Jerry Jankovich, plant superintendent, testified that the baghouses were inspected one or two times a day and 24-hour maintenance service was maintained. He also stated that a posted speed limit of 8 miles per hour was strictly enforced within plant boundaries. Both Jankovich and Norton testified that no trucks were allowed to leave the premises without being covered.

Petitioner's director of safety and environmental quality, Arvid Tienson, expressed the opinion that the emissions from the plant did not constitute a medical hazard to people in the community. He testified that the emissions essentially consist of calcium carbonate which is nontoxic and nondangerous. Any eye irritation caused by the dust was due to mechanical abrasion in the same manner as sand. This opinion was shared by Dr. Harold Steinberg, petitioner's medical expert. He testified that calcium carbonate does not "elicit a fibrous response," and causes no permanent tissue injury. The witness did state that high concentrations of the substance can produce temporary swelling of the mucous membranes. He had no knowledge of the calcium carbonate concentrations in the area of petitioner's plant.

Petitioner demonstrated the industrial nature of the area in which its plant is located. It is situated on the Calumet River and to the north are such companies as Diamond Salt, Chicago Block, Marquette Cement, and Youngstown Sheet and Tube. To the west are Terminal Warehouse, Material Service Corporation, and General Mills. Interlake Steel, Republic Steel, Great Lakes Carbon, Continental Grain and Allied Chemicals are located to the south of petitioner's plant. There was evidence that the steel mills and other industrial facilities emit pollutants into the atmosphere.

The Board, in its written opinion, summarized the testimony of the Agency's witnesses as well as that of petitioner's experts and employees. Based on the evidence the Board found that emissions from petitioner's plant constituted air pollution within the meaning of section 9(a) of the Environmental Protection Act.

We first consider whether there is evidence that petitioner's emissions

constitute air pollution as defined in section 3(b). Section 3(b) lists two types of air pollution. One is the presence of contaminants in the atmosphere in sufficient amounts, characteristics and duration as to be injurious to human, plant or animal life, to health, or to property. The second category is the presence of contaminants in such amounts and characteristics as to unreasonably interfere with the enjoyment of life and property.

■■ The Agency has the burden of proving that respondent caused or threatened to cause air pollution. (Ill. Rev. Stat. 1973, ch. 111½, par. 1031(c).) The findings of the Board are deemed prima facie true and there need only be some competent evidence in the record sufficient to support its findings. (*Cobin v. Pollution Control Board* (1974), 16 Ill. App. 3d 958, 307 N.E.2d 191.) This court may disturb the Board's decision only if we find that it is against the manifest weight of the evidence. *City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161.

■■■ Our review of the record convinces us that the Board's findings of air pollution on the part of petitioner in violation of the act is supported by substantial evidence. Abundant evidence was introduced as to the quality and quantity of the emissions, the extent of the dust problem, and petitioner's responsibility for them. That proof of the violation is based on the testimony of private citizens rather than technical experts does not render it insufficient to sustain a finding against petitioner. (*Sangamo Construction Co. v. Pollution Control Board* (1975), 27 Ill. App. 3d 949, 328 N.E.2d 571.) It is true that petitioner introduced evidence that a number of pollution sources, including several steel mills, were present in the neighborhood. Though the Board considered this to be a mitigating circumstance, it found that petitioner, "either alone or in combination with contaminants from other sources," had caused air pollution. In view of the testimony, we cannot say that the Board's decision is against the manifest weight of the evidence.

Petitioner next contends that the Agency failed to prove that its emissions "unreasonably interfere with the enjoyment of life and property." Petitioner argues that in order to establish air pollution as defined in section 3(b), the Agency has the burden of proving the unreasonableness of its conduct in terms of four criteria enumerated in section 33(c) of the Act. (Ill. Rev. Stat. 1973, ch. 111½, par. 1033(c).) That section directs the Board to consider all relevant facts and circumstances which go to the reasonableness of the alleged practice, including the type of injury involved, the social or economic value of the practice, its suitability to the area, and the technology which should be required to reduce or eliminate the pollution source. Under petitioner's view, the evidence does not support a negative finding as to each of the

factors set forth in section 33(c), and unreasonable interference has not been shown.

■■ The term unreasonable interference does not require proof with respect to each of the criteria listed in section 33(c). (*Processing & Books, Inc. v. Pollution Control Board* (1976), 64 Ill. 2d 68.) The term, as used in section 3(b), was intended to introduce into the statute the objective quality of the common law and refers to "a substantial interference with the enjoyment of life and property." (*Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill. 2d 290, 319 N.E.2d 794.) There is ample evidence in the record to support a finding that petitioner's emissions substantially interfered with its neighbors' enjoyment of life and property.

■■ Petitioner next complains that the Board failed to demonstrate compliance with section 33(c) factors in that the order did not indicate consideration of each factor enumerated therein. While the Board must consider the section 33(c) factors in its written opinion, a distinct finding as to each enumerated factor is not required. (*Sangamo Construction Co. v. Pollution Control Board* (1975), 27 Ill. App. 3d 949, 328 N.E.2d 571.) Our examination of the record indicates that the Board did take into consideration the factors listed in section 33(c) in reaching its determination.

Consideration of the "injury or unreasonable interference with property" is apparent as the Board discussed at length the problems and complaints of area residents. The Board observed that petitioner's emissions caused no permanent injury, and that was considered a mitigating factor. Concerning the "social and economic value of the pollution source," the Board heard considerable testimony on the process of manufacturing lime and the use of the product. The Board noted that petitioner had installed sophisticated air pollution control equipment and had done much to control its emission. The Board concluded, however, that more was required. The Board discussed the suitability of petitioner's plant to its location and decided that this, too, was a mitigating factor. In regard to the fourth factor, technical feasibility, the Board acknowledged petitioner's past efforts and directed it to formulate an improved program of housekeeping and maintenance.

Having examined the entire record, we believe that the Board determined the reasonableness of petitioner's conduct in light of the factors set forth in section 33(c). While not as specific as it might have been in setting forth findings as to each factor, the Board's written opinion demonstrates substantial compliance with the Act. It is not necessary to reverse the Board order or remand this cause for further findings. See *Incinerator, Inc. v. Pollution Control Board; Sangamo Construction Co. v. Pollution Control Board.*

Petitioner finally contends that the $20,000 fine imposed is arbitrary and excessive. The Board is vested with broad discretion in imposing a civil penalty (Ill. Rev. Stat. 1973, ch. 111½, par. 1005), and, absent an abuse, its determination will not be disturbed on review. The penalty was imposed after extensive hearings which indicated that petitioner, for a long period of time, had interfered with the enjoyment of life and property in ways that reasonably could have been avoided. We cannot say that the Board abused its discretion in fixing the fine.

Accordingly, the Board's order, directing petitioner to cease and desist from violations of section 9(a) of the Environmental Protection Act, and imposing a fine of $20,000 upon petitioner for past violations, is affirmed.

Order affirmed.

MEJDA, P. J., and DEMPSEY, J., concur.