WASTELAND, INC., *et al.*, Petitioners, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Third District No. 82—800

Rule 23 order entered August 9, 1983.—Opinion filed November 21, 1983.

Brian J. O'Hara, of Arnold & Kadjan, of Chicago, for petitioners.

Neil F. Hartigan, Attorney General, of Springfield (Gerhardt Brackel and William J. Barzano, Assistant Attorneys General, of counsel), for respondents.

JUSTICE ALLOY delivered the opinion of the court:

Wasteland, Inc., and Roger Pemble appeal from the administrative decisions of the Illinois Pollution Control Board (the Board) entered after hearings on alleged violations by Wasteland and Pemble in the operation of a solid waste landfill in Will County. Review is sought pursuant to section 41 of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1981, ch. 111½, par. 1041). The Board found that Pemble and Wasteland, in their operation of the landfill site, had violated numerous rules and regulations applicable to them, both under the Act and under Board rules. The Board revoked their operating permit and ordered them to cease and desist from further violations and from accepting refuse at the landfill site and at a paper recovery site. It also imposed a monetary penalty of $75,000 as a result of the violations. The Board further required the posting of a $100,000 performance bond to insure compliance with other provisions of its Order. These provisions (1) required a clay covering to be applied to the site; (2) required a complete hydrogeological study of the site; and (3) required the taking of certain remedial measures or the permanent closing of the site. On appeal, Wasteland and Pemble argue that the Board's findings are not supported in the record and that the remedies imposed for the violations were improper, extreme and unwarranted. An issue is also raised respecting restrictions imposed by the hearing officer on their cross-examination of an agency witness.

Two parcels of real estate in Will County are the subject of the instant case. The principal property involved is a solid waste landfill, located in unincorporated Will County, and operated by Wasteland, Inc., and Pemble. The other parcel is used as a waste paper recycling center and is operated by Waste Resources Corporation and Pemble, as general manager of the site. The two parcels are noncontiguous. The landfill property had been issued a permit by the Illinois Environmental Protection Agency (hereinafter referred to as IEPA) for use as a solid waste landfill. In the spring of 1980, Pemble entered into a five-year lease of the property with the holder of the beneficial interest under a land trust. Wasteland was then incorporated by him to engage in the waste and refuse disposal operations at the landfill site. Wasteland succeeded to Pemble's lease of the landfill property. While some removal and deposit operations occurred at the landfill during May through August 1980, Pemble did not formally become the permit holder until after the filing and approval of a permit transfer application. Approval was granted on October 20, 1980. Under the original permit, transferred to Pemble, the landfill was permitted

"to handle brick, concrete, pavement, glass, clay, tile, ceramics,

cement and other non-putrescible, non-combustible solid waste excluding all flammable general refuse, all liquids and hazardous waste, unless other authorized by supplemental permit \*\*\*."

After operating the landfill for a time, Pemble decided it would be profitable to open a recycling center, where paper products could be separated out and resold to paper mills. Pemble had found that there was a substantial amount of paper and cardboard included in refuse deposited at the landfill. Accordingly, he leased the paper recovery site and began operations for recycling paper. Waste Resources Corporation was incorporated for the purpose of operating the recovery site in February 1981, and it took over the lease on the property and rented the buildings and equipment from Pemble. Pemble was a shareholder in the business, as well as president of the corporation and manager of the business at the site. Under the plan, when substantial loads of paper material were brought to the landfill, they would be directed to the paper recovery site, for processing there. If a load consisted of paper products and solid waste products, the load might either be directed to paper recovery or dumped at the landfill for segregation of paper products, with later transfer to paper recovery. According to Pemble's testimony, that was in fact how the operations were conducted. The IEPA's evidence, however, contradicted much of his testimony.

In pertinent part, the IEPA's complaint against Pemble, Wasteland, and Waste Resources alleged violations of the Act and Board Rules from October 20, 1980, onward, in that Wasteland: (1) accepted and disposed of unpermitted refuse at the landfill; (2) accepted a much greater amount of material than permissible under their operating permit; (3) failed to provide the required daily clay cover for the landfill; (4) modified the landfill without obtaining necessary permit modification; (5) improperly scavenged material at both the landfill and paper recovery sites; (6) created a threat of water pollution at the landfill; (7) failed to control road and dust problems attendant with the landfill; (8) improperly disposed of waste, without a permit, at the paper recovery site; and (9) engaged in open burning. The Board found that all of the above violations had been proven by the evidence submitted at the administrative hearing. No useful purpose would be served by our detailing the extensive evidence presented at the hearing. We shall note specific evidence, where necessary, in the discussion of each violation. Pemble and Wasteland argue that there was insufficient evidence to support the violations findings of the Board.

The first argument raised on appeal, however, addresses the issue of whether Wasteland's due process rights were violated by the hearing officer's failure to allow cross-examination respecting an agency wit-

ness' testimony.

The essential background facts on the cross-examination issue indicate that Jeffrey Stofferahn testified as an IEPA witness at the hearing. Stofferahn was an environmental specialist whose duties included the inspection of all landfills in Will and Kankakee counties. During his inspections Stofferahn would make notes concerning the site and observations made at the time of the inspection. Included would be activities observed, violations noted, and drawings or sketches of pertinent information. This material formed the basis for preparation of an "Inspection Report" for each inspection. On occasions, photographs of the site and its activities were also appended and incorporated into the inspection reports. Stofferahn would also prepare "Observation Reports" on follow-up visits made after full scale inspections. These were prepared in a manner similar to that followed with inspection reports. On a number of occasions between July 1980 and December 1981, Stofferhan inspected or visited the Wasteland sites, each time preparing an inspection report, or, if no full inspection was made, an observation report. At the hearing, Stofferahn testified that he was unable to recount his observations of the Wasteland site during each inspection or visit. Counsel for the IEPA inquired of his ability to recollect the contents of the reports, and then moved that certain reports, those for which he had no independent recollection of their contents, be received into evidence. Over objection by Wasteland's counsel, the reports were received, the hearing officer ruling that they qualified under the hearsay exception, as past recollections recorded and business records.

It must be noted that Wasteland's counsel conducted extensive cross-examination of Stofferahn on much of his testimony. During the cross-examination several questions were asked concerning the contents of those reports previously received under past recollection recorded. Stofferahn's response was either to read from the report or to state that he had no recollection of the circumstances set forth in the reports. The hearing officer thereafter ruled that he would permit no further cross-examination concerning those matters for which Stofferahn had no independent recollections, being primarily the contents of the reports. Objection was made by Wasteland.

■■■■ The right of a party involved in an administrative hearing of this type to cross-examine witnesses is firmly established (Ill. Rev. Stat. 1981, ch. 111½, par. 1031(c); *Golden Egg Club, Inc. v. Liquor Control Com.* (1970), 124 Ill. App. 2d 241, 260 N.E.2d 329) and not disputed by the Board herein. In the instant case, Wasteland was not denied the right to cross-examine Stofferhan on his testimony at the hearing. Extensive cross-examination occurred. The restriction upon

Wasteland's cross-examination was narrowly limited to questions concerning the contents of prepared reports, reports which it had previously been determined the witness had no recollection concerning. Further, the restriction on further cross-examination was imposed after questions concerning the contents were answered either with a lack of recollection or based solely on those contents. While counsel should certainly be given liberal cross-examination scope, within which to probe the witness' statement that he had no recollection, and his testimony as to the manner and timing of the recordation, endless cross-examination about the contents of the reports, where no recollection is shown, would be a waste of time. The hearing officer, at the time of his ruling, noted that because the witness could not recollect the contents independently and they did not refresh his memory, any cross-examination on such matters would be futile. While, as a general rule broad cross-examination is to be allowed, we find no reversible error in the hearing officer's ruling in the instant case, where the record shows prior cross-examination on the matter to have been largely fruitless and the hearing officer had determined the witness had no recollection of the contents.

 We turn then to the violations found to have been committed by Pemble and Wasteland, and to the issue of whether those Board determinations are contrary to the manifest weight of the evidence. (*Wells Manufacturing Co. v. Pollution Control Board* (1978), 73 Ill. 2d 226, 234, 383 N.E.2d 148.) Count II of the IEPA's complaint alleged that Wasteland and Pemble had accepted and disposed of unpermitted refuse at the landfill. There is substantial evidence in the record indicating that on numerous occasions unpermitted materials were accepted and disposed of at the landfill site. The record establishes that certain combustible, nonferric auto waste (shredded interiors, rubber hoses and plastic), referred to as "Pielet Brothers" material, was deposited at the landfill. The presence of this material was detailed by Stofferahn in his testimony and confirmed by the testimony of Will County health inspectors. The inspectors testified that odors they smelled from material burning on the site was completely consistent with odors created by burning of "Pielet Brothers" material. Contrary to Wasteland's argument, the combustible nature of those materials did not need proof by scientific experts. Pemble himself admitted to health inspectors that the landfill was not permitted to take such materials. In addition to this material, the reports and testimony from agency witnesses also indicated that large amounts of paper, cardboard, garbage and other nonpermitted refuse was deposited, spread and buried at the landfill. This was indicated by inspection reports from three different inspectors,

with supporting photographs. Wasteland contends that the Board ignored testimony from its personnel that this material was routinely sorted out and removed, for transfer to the paper recovery site. The record indicates that this testimony was not ignored, but disbelieved, and questions of credibility are for the fact finder. That Wasteland testimony was substantially contradicted by the agency witnesses and photographs. In addition, one of Wasteland's own employees, a bulldozer driver at the site, testified that on Pemble's instructions he regularly compacted and covered all paper and cardboard which was not worth salvaging. He also stated that over half of the refuse actually buried at the landfill was paper and cardboard, therefore unpermitted combustible material. The Board's conclusion as to count II was not contrary to the manifest weight of the evidence.

Count III alleged that Wasteland had violated applicable rules by accepting volumes of material grossly in excess of that permitted, and the Board found that a violation was committed. The 1976 permit application for the landfill estimated that it would handle 500 cubic yards per day, 3,000 per week or 150,000 per year. The permit that was granted stated that the landfill must be operated in accordance with the permit application. The Board found, based upon Wasteland's answer to interrogatories, that the landfill had accepted over 149,000 cubic yards of refuse during a 14-week period from July to October 1981. That amount would be almost three times the amount estimated in the permit application. The Board held that while minor fluctuations above estimates would not warrant a finding that a violation had occurred, evidence indicating gross exceedance of the estimates warranted such a finding. Wasteland's objection to the Board's finding focuses upon the computation of the amount accepted, and reliance is placed upon Pemble's discounted testimony that unpermitted material was routinely removed from the site. As already noted, credibility decisions were for the fact finder, and the decisions find support in the evidence. The record supports the Board's conclusion that Wasteland accepted amounts of refuse greatly exceeding its permit.

Count IV alleged that Wasteland had failed to provide the requisite daily cover of clay, six inches deep, over exposed refuse at the landfill. The IEPA evidence, in the form of reports, testimony and photographs, establishes this failure on a number of occasions. No purpose would be served by detailing that evidence. The Board's finding of a violation, under this count, is not contrary to the manifest weight of the evidence.

Similarly, the Board's finding, under count V, that Wasteland modified the landfill without the necessary supplemental permit is not con-

trary to the manifest weight of the evidence. There is no question that the landfill was also operated as a salvage yard and transfer facility. The Board found that such uses of the property violated the prohibition against modification of permits without obtaining supplemental permit authority. Wasteland's argument that the Board finding is in error because Waste Resources Corporation, and not Wasteland, operated the paper recovery site misses the basis for the violation. The violation was not premised upon activity by Waste Resources at the recovery site. The finding of a violation was not premised upon activity by Waste Resources at the recovery site. The finding of a violation was directed at the unpermitted activities by Wasteland at the landfill site, preparatory to transfer to Waste Resources. There is no Board finding of an impermissible interrelationship between Wasteland and Waste Resources. The finding that the operation had been modified without supplemental permit is supported in the record.

█ The Board also found to have been proven the allegations of count VI, that respondents had caused, threatened or allowed the discharge of contaminants into the environment so as to cause ground water pollution. The Board, on the basis of evidence in the record, found a potential and existing leachate problem, creating a danger of water pollution. This finding was premised upon the presence of unpermitted contaminant producing materials for which the landfill was not designed, coupled with the lack of natural barriers in the area to safeguard against water pollution. Wasteland objects that a violation cannot be based merely upon the threat of water pollution. Yet, Solid Waste Rule 313 specifically refers to persons threatening discharge of any contaminants so as to cause water pollution, and this court has upheld violations based upon the threat of pollution. (*Allaert Rendering, Inc. v. Pollution Control Board* (1980), 91 Ill. App. 3d 153, 414 N.E.2d 492; *City of Pekin v. Pollution Control Board* (1977), 47 Ill. App. 3d 187, 361 N.E.2d 889.) In *City of Pekin* we specifically upheld the Board's finding a danger of water pollution, even though there was no actual evidence of pollution. The pertinent considerations therein were the characteristics of the landfill area and the fact that unpermitted wastes had been disposed of at a landfill not designed for them. Similarly, herein, the record indicates that it is the unpermitted materials, paper, cardboard and garbage, which create leachate formation. The nonputrescible and noncombustible wastes for which the landfill was permitted do not generally create such problems. The landfill herein was granted a permit for those wastes, while the record clearly demonstrates that large amounts of paper, cardboard and garbage were accepted. Because the permit did not cover those materials, the

measures designed to protect against water pollution where those materials were being deposited, were not required of the landfill operators. Thus, no sufficient protective barriers were required or built into the landfill. No clay footliners, designed to retain leachate, were present, nor were monitoring wells built to track such potential problems. Given the presence of unpermitted material, likely to create leachate problems, and the lack of natural or required safeguards against water pollution, the Board's finding that the landfill constitutes a threat of water pollution is supported in the record. Further, the evidence indicates that several observers noted ponding and leachate seepage on the site. The finding of a violation under count VI is not contrary to the manifest weight of the evidence.

■ Another violation found to have been committed at the landfill was the scavenging operations that did not conform to the regulations and rules governing salvaging. The evidence in the record sufficiently supports the Board's conclusions that the salvaging operations conducted by Wasteland were not confined to an area removed from the operating face of the landfill and were not conducted in a sanitary manner. Evidence before the Board also indicated that the salvaging did interfere or delay the operation at the landfill and did create a nuisance. All this is contrary to Board Solid Waste Rule 307. Wasteland largely asserts that the evidence is not in the record, yet the assertion is contradicted by exhibits and testimony in the record. Pemble himself admitted that the required covering was delayed for salvage operations. Other evidence indicated scattered litter and uncovered refuse. Wasteland next asserts that the salvage rules that were violated only applied to sanitary landfills, and had no application to this landfill because it is a solid waste landfill. We agree with the Board's response that where activities are engaged in which go beyond the scope of the permit, so as to enlarge and alter the nature of the operation being conducted, the Board rules pertaining to the extended operations are applicable, regardless of permit characterization of the site. In effect, Wasteland wishes to rely upon their permit, designating this site a solid waste landfill, despite the fact that it was utilized by them as a sanitary landfill. The Board correctly determined that the substance of the operations, and not the formal permit designation, governs the application of Board rules and regulations. By choosing to operate the landfill as a sanitary landfill, with salvaging, Wasteland brought itself within the requirements applicable to salvaging operations. The requirements under the rules are for the protection of the environment and neighboring parties from problems associated with specific types of activities. Where the activities are being conducted by operators, regardless of

whether formally encompassed by their permit, the rules and regulations apply.

Another violation was committed by Wasteland and Pemble in their failing to provide for adequate roads and dust control at the landfill site. Contrary to their assertion that the mud problem on the highway was not shown to be connected with the landfill, the record contains ample evidence from which the Board could properly conclude that the mud problem was the result of trucks leaving the landfill. One of the co-owners of the landfill admitted to paying fines for truckers who were cited for depositing mud and debris on the road. Other evidence indicated that Pemble did not close the landfill on rainy days, when much mud could be expected to be deposited on the highway. The testimony from neighbors, highway personnel and a State trooper all pointed to Wasteland's landfill as the source of numerous road problems in the area. The violation was proven.

Count IX of the complaint alleged violations in that Wasteland and Pemble had caused or allowed open dumping at the paper recovery site. It was also alleged that they had conducted an unpermitted refuse disposal operation there and that they had disposed of waste at an unpermitted site. (Ill. Rev. Stat. 1981, ch. 111½, pars. 1021(a), 1021(d).) There is no factual dispute that paper and cardboard, along with other refuse material, was disposed of at the paper recovery site. Nor is there dispute that no one had obtained a permit for such disposal operation. Wasteland and Pemble's argument is that no permit was required for disposal of refuse at the paper recovery site under section 21(d) of the Act. Section 21(d) exempts from permit requirements on site disposal of refuse generated by an operator's own activities. (Ill. Rev. Stat. 1981, ch. 111½, par. 1021(d).) Wasteland argues that the unrecycled paper and cardboard deposited at the recovery site was refuse generated by the activities of Waste Resources. We find, however, that the salvaging operation, wherein some refuse was scavenged and resold, while other was deposited on site, was not intended to be covered by the section 21(d) exemption. (*Peilet Brothers Trading, Inc. v. Pollution Control Board* (1982), 110 Ill. App. 3d 752, 442 N.E.2d 1374.) The court in *Pielet* established that salvage operations, there automobile salvage, were not subject to the exemption under the Act, since the material refuse they dealt with was not generated by their operations, but by other's operations prior to transfer to the salvage yard. As noted, to hold otherwise would defeat the purposes of the Act. (110 Ill. App. 3d 752, 755. See also *R.E. Joos Excavating Co. v. Pollution Control Board* (1978), 58 Ill. App. 3d 309, 374 N.E.2d 486.) Furthermore, in *Pielet Brothers* the court upheld the Board's construction

of the exemption narrowing it to operations where only minor amounts of refuse are deposited which can be disposed of without environmental harm. In the instant case, the materials brought in and segregated for shipment or disposal on site were generated by other's operations, not by the operations of Waste Resources, so far as the section 21(d) exemption is concerned. In addition, the amount of refuse disposed of, on site, without a permit was not minor. Pemble testified that the buried material covered three to four acres and measured seven to 10 feet thick. The Board correctly concluded that the section 21(d) exemption did not apply to operations at the paper recovery site.

■ Wasteland and Pemble next object to the Board's assignment of responsibility to them for the operations at the paper recovery site, which was subsequently run by Waste Resources Corporation. The argument is that Waste Resources ran the recycling center and therefore they may not be held responsible for violations there. Evidence in the record establishes Pemble's direct connection to both Waste Resources and Wasteland, as well as a strong interrelationship between Wasteland and Waste Resources. Pemble was general manager of operations at both the landfill and the recovery site. Under Board Rule 104(e) of chapter 7, he, as manager, is held to be an operator of the sites, responsible for operations thereon. Wasteland was the lessee of the site and owned equipment in use at the recovery site. In addition, both Wasteland and Pemble admitted in answers to a request to admit that they caused or allowed waste from the landfill to be collected and deposited at the recovery site prior to and after February 5, 1981. Pemble also described in his testimony how the two operations were combined operations, working closely together. Early in the recovery site operation, checks for the sale of salvaged paper and cardboard were made out to Wasteland. When Waste Resources was incorporated on February 27, 1981, Pemble's wife was 50% stockholder and Pemble was president and general manager. Pemble's salary was paid by Wasteland and not by Waste Resources. At times, Wasteland paid bills for Waste Resources. On the basis of all of the foregoing, we find no error in the Board's conclusion that both Wasteland and Pemble could be held responsible for causing and allowing open dumping at the recovery site.

■ Count XI violations found by the Board to have been committed included causing, threatening or allowing a discharge of contaminants into the environment so as to cause air pollution and causing or allowing open burning. The evidence in the record is fully sufficient to support the finding that both sites were so operated that the threat of air pollution, from potential fire, existed. Particularly dangerous was

the paper recovery site, where large amounts of paper and cardboard had been spread over the site. Pemble admitted, as noted, that the accumulation covered three to seven acres, seven to 10 feet deep. Large piles of paper, cardboard, and Pielet Brothers material were seen by agency personnel on several occasions. The threat of fires, with resultant air pollution, from the improper and unpermitted manner in which material was disposed of by Wasteland and Pemble was shown in the record. With respect to the open burning violation, we find the Board's conclusion to have been in error, for it has been established that where there is no evidence that fires have been intentionally set for the purpose of disposing of refuse, there is no violation. (*People v. Joliet Ry. Equipment Co.* (1982), 108 Ill. App. 3d 197, 205, 438 N.E.2d 1205.) We decline the Board's suggestion that we read *Joliet Ry.* and *McIntyre v. Pollution Control Board* (1972), 8 Ill. App. 3d 1026, 291 N.E.2d 253, as applying only to metal salvage yards. Here there was no evidence of intentional burning. While we find error in the Board's finding of an open burning violation, we note that no penalty was assessed for this violation, the Board concluding that the losses suffered by the operators, as a result of the fires, was penalty enough.

The final issues raised on the appeal center upon the propriety of the sanctions imposed by the Board upon Pemble and Wasteland. These included a $75,000 civil monetary penalty, a remedial program at the sites, and a $100,000 performance bond to insure compliance with the remedial program. The program included a clay cover for the site and hydrogeological studies. The Board also ordered them to remove all refuse from both sites, or to apply to the IEPA for a supplemental closing permit, which would encompass construction of leachate monitoring wells, vents, flares and other steps to isolate and contain the combustible refuse. The Act provides for such sanctions, within the Board's discretion, provided they are warranted by various considerations. (Ill. Rev. Stat. 1981, ch. 111½, par. 1033.) Under section 33(c) (Ill. Rev. Stat. 1981, ch. 111½, par. 1033(c)), the Board is required to consider all facts and circumstances, including, but not limited to:

"[1.] the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

[2.] the social and economic value of the pollution source;

[3.] the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

[4.] the technical practibility and economic reasonableness of reducing or eliminating the emissions, discharges or deposits re-

sulting from such pollution source."

On appeal, Wasteland and Pemble argue that the Board failed to give sufficient consideration to the section 33(c) factors in assessing its penalties. In its lengthy order and opinion in this case, the Board addressed the considerations. The Board found that the operation of the sites had injured and interfered with the health, welfare and property of persons in the area. It cited rat problems, litter, dust and smoke, as well as highway dangers arising from the operations. The Board further found that because of the presence of putrescible, combustible materials at sites not designed for such materials, there existed potential danger to the area from leachate, underground fires, and gas production. The findings of the Board on these matters are supported in the record, which indicates both past problems and further potential danger. Furthermore, the Board would have been remiss in its duty if it had not attempted, through a remedial program, to monitor and limit future potential dangers, to the fullest reasonable extent. The Board ordered operations at both sites to stop, and it ordered the required clay covering to be put on the landfill site, as per Board rules respecting final landfill coverings. Further, the Board, as a first step in assessing past and potential pollution, ordered that a hydrogeological study be made in order to obtain basic information concerning necessary additional remedial steps. We would note, in this connection, that such a study, along with clay liners, would have been required before a permit would be issued for landfilling of combustible, putrescible material. The Board also concluded, under the second consideration, that the landfill, if properly managed, could have a social and economic benefit to the area. However, it found that as operated, it was a detriment. This finding is supported in the record, the violations and their problems having already been set forth. The record contains some evidence indicating that Pemble considered, at one time, obtaining the necessary permit, but discarded the idea because of the costs for necessary site evaluation and development work. As it stands, the record indicates that Pemble proceeded without the permit, changing the nature of the landfill, instead of performing the necessary work and obtaining a permit properly.

The evidence in the record as to the suitability of the site indicated that the site was not suitable for the landfilling of putrescible, combustible materials. The geology of the area presented no natural barrier to leachate transmission, and the site is located over a dolomatic aquifer, near the Illinois and Michigan Canal. The Board's conclusion that the unpermitted operations were not suitable for the area is supported in the record. Neither, from the record, does it appear that the landfill

operation enjoys priority of location.

The Board noted, too, its consideration of the reasonableness of reducing or eliminating the emissions, discharges and deposits. Much of the requirements of the remedial program ordered by the Board are measures routinely required or utilized at landfills of the type operated herein. A hydrogeological study with monitoring wells is a regular requirement at landfills of putrescible, combustible material. Similarly, containing leachate with clay liners, absent natural barriers, is commonly required at such landfills. Gas vents and monitors are commonly utilized to meet gas problems posed by such landfills. Without these measures, commonly required for such landfills in order to prevent pollution otherwise attendant, potential dangers are present. Under the circumstances, and absent proof by Wasteland that compliance with the order imposed an arbitrary or unreasonable hardship, we are unable to find the Board's conclusions contrary to the manifest weight of the evidence.

██ Finally, the question of good faith, or the lack thereof, is pertinent to the issue of sanctions. The Board found, and the finding is supported in the record, that the sites had been operated in blatant disregard for the Act, the Board rules, and overall environmental safety. It noted improper operations continuing despite notice of violations from State and local officials. The operations continued, to Wasteland and Pemble's economic benefit, in disregard of warnings and directions to cease unpermitted activities. It appears in the record that Pemble, at the same time assuring officials he would cease such activity, continued accepting unpermitted material. We find the Board's findings as to section 33(c) considerations to be supported in the record. Further, the nature of the unpermitted operations, including the dangers posed from them in the future, justify the remedial program set forth by the Board. It is reasonable, under the circumstances. So, too, is the two-step permit process, designed to insure that the program is carried out under agency scrutiny. A permit will be required in order to install and operate the monitoring system, and a second permit in order to proceed with appropriate engineering work, based upon data acquired through the monitoring system. The goal of the program is to make the site safe and suitable for the presence of the unpermitted material, material which would not have been there but for Pemble and Wasteland's disregard for applicable rules and regulations. We note that the program adopted leaves to Wasteland and Pemble some flexibility in designing and choosing specific measures, based upon dangers found to exist. Thus, should the Board arbitrarily or unreasonably deny a permit for the system Wasteland and Pemble feel is adequate, they would have

recourse to the courts.

■■■ Finally, we find no reversible error in the assessment of the $75,000 penalty. Wasteland and Pemble's bad faith, alluded to above, is demonstrated in the record. (Compare *Mystic Tape v. Pollution Control Board* (1975), 60 Ill. 2d 330, 328 N.E.2d 5, with *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406.) Here, violations of the Act and Board rules were shown to have been committed over a period of a year. The civil penalty limits of $10,000 per violation and $1,000 per day for violations were not exceeded in this case. Further, the Board found substantial savings accrued to Wasteland and Pemble from their sidestepping of applicable rules and regulations. The figures for those substantial cost savings, as well as for the profits from site operations, were in the record. An estimated $17,000 to $25,000 was saved by burying unpermitted wastes at the landfill, rather than removing it and disposing of it properly, and the figure for the recovery site was approximately $45,000. The basis for the figures is in the record. The Board's conclusions on these matters is not contrary to the manifest weight of the evidence, and the penalty assessed, on these facts and circumstances, is within the Board's discretion. We find that the penalty serves the legislative purpose of aiding enforcement of the Act, for through penalties upon those who blatantly disregard applicable rules and regulations, others, who might consider cutting corners at the expense of the environment, are deterred. This is not a case where the operators have made efforts to comply in order to minimize risks to the environment. This is a case of continuing blatant disregard for requirements and procedures designed to protect the environment while permitting useful operations. This is a case, on the record, of a blatant disregard for the environment. In the instant case, the severity of the punishment is related to the conduct of the defendants and the seriousness of the dangers posed by that conduct.

The decision of the Board is affirmed in its entirety, except for the finding of the open burning violation, which did not affect the sanctions imposed.

Affirmed.

STOUDER, P.J., and BARRY, J., concur.