STANDARD SCRAP METAL COMPANY, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (1st Division) No. 85—0726

———

Opinion filed March 31, 1986.

Erica Tina Helfer, of Rosenthal & Schanfield, and Joseph S. Wright, Jr., of Martin, Craig, Chester & Sonnenschein, both of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (William J. Barzano, Jr., Assistant Attorney General, of Chicago, of counsel), for appellees.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Standard Scrap Metal Company (Standard Scrap) appeals from an administrative decision of the Illinois Pollution Control Board (the Board) entered after hearings on alleged violations by Standard Scrap in the operation of its reclamation facility in Chicago. Direct review is sought pursuant to section 41 of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1041). For the following reasons, we affirm the decision of the Board.

Standard Scrap owns and operates a facility at 4004 South Wentworth Avenue in Chicago for the reclamation of scrap metals such as aluminum and copper. The reclaimed scrap metal is sold primarily to steel smelters and refiners. The facility contains a gas-fired boiler, a wire-burning incinerator and two aluminum sweat furnaces, one of which is currently inoperable. The facility is located in an area which is primarily devoted to industry, but also includes residential property and public housing.

On February 23, 1983, the Illinois Environmental Protection Agency (the Agency) filed with the Board a five-count complaint against Standard Scrap, alleging violations of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1985, ch. 111½, par. 1001 *et seq.*) and the Illinois Air Pollution Control Board Rules and Regulations, chapter 2: Air Pollution (Rules). Specifically, in count I the Agency alleges that Standard Scrap operated its emission sources, *i.e.*, the boiler, incinerators and sweat furnaces, without the operating permits required under section 9(b) of the Act and Air Rule 103(b)(2). Count II alleges that Standard Scrap caused or allowed the emission from its plant of smoke or other particulate matter into the atmosphere of an opacity greater than the 30% standard contained in Air Rule 202(b). Count III alleges that Standard Scrap caused or allowed the continued operation of its wire-burning incinerator during the malfunction of the incinerator's afterburner control equipment, in violation of section 9(a) of the Act and Air Rule 105(a). In count IV, it is alleged that Standard Scrap caused or allowed the emission of particulate matter from

its wire-burning incinerator and aluminum sweat furnace in amounts exceeding the allowable emission rate under Air Rule 203(a). Finally, count V alleges that Standard Scrap caused or allowed the open burning of wire insulation in violation of section 9(c) of the Act and Air Rule 502(a).

At hearings before the Board on the allegations set forth in the complaint, the parties stipulated to the following facts: that Standard Scrap never had operating permits for the wire-burning incinerator or the two aluminum sweat furnaces; that from February 7, 1974, until April 16, 1983, Standard Scrap did not have an operating permit for its gas-fired boiler; that the boiler was operated on March 30, 1979, December 30, 1980, and January 21, 1983; that Standard Scrap operates one of its sweat furnaces and the incinerator an average of eight hours a day, three days a week and 40 weeks per year.

The parties further stipulated to actual emissions from Standard Scrap's sweat furnace and incinerator greater than the allowable rates. Specifically, it was stipulated that the actual emission rate from Standard Scrap's sweat furnace, as calculated on or about November 16, 1982, was .815 lbs./hr. The allowable rate under Rule 203(a) is .55 lbs./hr. The actual emission rate from the incinerator, as calculated prior to September 1982, was stipulated at 4.85 lbs./hr.; the allowable rate is .68 lbs./hr.

The Agency presented evidence to the Board showing that during a period of three years beginning in March 1980, Standard Scrap failed to cooperate with Agency efforts to bring the facility into compliance. In particular, the evidence showed that on March 17, 1980, Alfred Lesko, an engineer employed by the Agency, sent a letter to Ronald Kanter, secretary-treasurer of Standard Scrap, notifying him of permit and other air pollution violations at the Wentworth facility. Receiving no response, Lesko again sent Kanter a letter on May 19, 1980, requesting a meeting. On June 20, 1980, Kanter met with Lesko to discuss the violations. At that time, Kanter agreed to apply for the necessary operating permits and to submit a proposal for changes to be made at the plant to correct the violations.

On July 17, 1980, the Agency sent Kanter another letter warning him of the violations. Later that month, Kanter replied, stating only that Standard Scrap had repaired the holding coil on the safety shut-off valve of its incinerator. On August 22, 1980, Kanter wrote to the Agency that Standard Scrap had eliminated "the particulate emission rate" of the furnace by buying only clean aluminum scrap and iron aluminum breakage "with nothing that will contaminate." Several days later, Standard Scrap also submitted applications for operating

permits for its incinerator and furnace. On October 15, 1980, the Agency asked Standard Scrap to provide information concerning the material to be sweated and incinerated. Standard Scrap failed to respond to this request, and the Agency therefore denied the applications on November 19, 1980. The denial was not appealed.

Standard Scrap took no action until more than a year later, and then only in response to further Agency warnings. On November 20, 1981, Kerry Keller of the Agency inspected the plant in response to a complaint about black smoke coming from a stack at the facility. At that time, Kanter told Keller that the plant did not have an incinerator or a boiler. Keller later discovered, upon reviewing Agency files, that the plant had been cited several times for failing to have operating permits for its incinerator and boiler. Consequently, an Agency attorney sent a letter to Kanter on December 21, 1981, warning of enforcement action. Two days later, Kanter requested more permit application forms, and Keller sent them to him that same day. However, when Keller inspected the plant on March 16, 1982, Kanter stated he had not received the forms. Keller therefore personally delivered permit application forms to Kanter on March 23, 1982, and requested a reply within 10 days.

In December 1982, the hand-delivered permit applications remained unfiled, and the Agency sent another letter to Kanter warning of impending enforcement action and asking for another meeting. A meeting was held on January 18, 1983, at which time Agency representatives again explained to Kanter what Standard Scrap must do to correct its violations. Following that meeting, the Agency sent Kanter a letter summarizing the compliance requirements and emphasizing the need for expeditious action. Kanter, however, did not respond to the letter until March 3, 1983, eight days after the Agency filed the complaint in the instant action. Standard Scrap submitted permit applications for its boiler, incinerator and furnace, which the Agency received on March 7, 1983. On April 16, 1983, the Agency issued an operating permit to Standard Scrap for its boiler, but denied permits for the other two emission sources because the information submitted about the incinerator was insufficient to determine compliance with Air Rule 203(a), and the data submitted about the sweat furnace indicated emissions exceeding those allowable under Air Rule 203(a). No appeal was taken from the Board's decision.

The Agency additionally presented evidence concerning emissions observed from Standard Scrap's facility. First, Agency reports showed that on July 16, 1980, two Agency engineers stopped to inspect the Standard Scrap plant because, while driving on the Dan Ryan Ex-

pressway, they observed the emission of heavy, voluminous smoke. The smoke partially obscured their vision. Upon arriving at Standard Scrap, Kanter told the engineers that the smoke was caused because the incinerator's afterburner had malfunctioned. Photographs taken by the engineers and admitted into evidence depicted heavy black smoke being emitted from Standard Scrap's incinerator stack at an opacity greater than the allowable 30%.

Agency documents revealed that on May 14, 1982, another Agency inspector took visible emission readings of the Standard Scrap incinerator stack between 8 and 8:15 a.m. During this time, the opacity ranged between 0% and 100%. Pictures taken by the inspector again depicted heavy smoke and particulates being emitted from the stack. When the inspector visited the facility, Kanter told him that the smoke was caused because the incinerator had not been "preheated for a long enough period."

Erica Karp, a social worker, testified that while driving southbound on the Dan Ryan Expressway on the morning of January 18, 1980, her vision was obstructed by black smoke coming from the west side of the highway. When she cleared the smoke, she observed that it appeared to be coming from a stack next to a building with Standard Scrap's name on it.

Philip Vadeboncoeur, an executive employed by a corporation located across the street from Standard Scrap, testified he has observed smoke being emitted from the Standard Scrap plant many times during the 18 years he has worked in the area. Vadeboncoeur testified that his company's employees have become ill when smoke from Standard Scrap is sucked into his building when the doors are opened for ventilation in the summer.

The Agency asked the Board to take judicial notice of an order it issued on February 7, 1974, concerning violations at the Standard Scrap facility, *IEPA v. Kanter* (Feb. 7, 1974), 11 PCB 171 (No. PCB—73—200). The order required Standard Scrap to purchase and install an afterburner for its aluminum sweat furnace in order to control emissions from the furnace and achieve compliance with the Act. The order was based on an agreement by Standard Scrap to install the afterburner "subject to the issuance of the necessary permits by the Agency and the City of Chicago ***." Standard Scrap never complied with the 1974 order.

James Levis, an economist employed by the Agency, testified that Standard Scrap saved approximately $104,500 by failing to install the afterburner required by the 1974 order. This figure was arrived at based on a computer program adopted by the United States Environ-

mental Protection Agency (USEPA). Levis testified that the computer program utilizes the following data: the estimated cost of the afterburner at the time that it was initially to be installed; the prevailing rate of inflation for the relevant time period; the discount rate, based on Standard Scrap's average return on stockholders' equity; the interest rate on Standard Scrap's long-term debt; Standard Scrap's marginal income tax rate; the investment tax credit rate; Standard Scrap's capital structure; and the depreciation life of the afterburner equipment.

Finally, Standard Scrap presented testimony pertaining to its financial situation. Daniel Frazin, the firm's outside auditor, testified that Standard Scrap is in "very serious financial shape." He admitted on cross-examination, however, that the company was in good financial condition in 1979 and 1980 and could have spent $30,000 for an afterburner during those years.

At the conclusion of the hearings, the Board issued an order and opinion in which it reviewed the evidence and made certain findings. The Board found Standard Scrap guilty on count I since 1974, on count II at least three times, on count III at least twice and on count IV at least once. The Board noted that under section 42(a) of the Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1042(a)), Standard Scrap is liable for a civil penalty of no more than $10,000 for each violation of the Act or Air Rules, and an additional maximum of $1,000 for each day the violation continued. The Board, however, considered Standard Scrap's financial condition as a mitigating factor to reduce the amount of the penalty to $30,000. In addition to the fine, the Board ordered Standard Scrap to obtain operating permits for its incinerator and operable aluminum sweat furnace, and to install an afterburner on the sweat furnace. The Board further ordered Standard Scrap to cease and desist operations until it had complied with the order.

On appeal, Standard Scrap challenges the Board's order as being arbitrary, capricious and an abuse of its authority and discretion. In particular, it argues that the $30,000 penalty bears no legitimate relationship to the evidence and does not aid in the enforcement of the Act; that the order is economically unreasonable; that there was no evidence to support the Board's finding that it operated its incinerator during afterburner malfunction; that the Board's reliance on its 1974 order was erroneous; and that the Board erred in relying on the Agency's "savings" calculation.

■ In addressing the arguments above, we initially observe that the Pollution Control Board is vested with broad discretionary powers in its imposition of civil penalties. (*Marblehead Lime Co. v. Pollution*

*Control Board* (1976), 42 Ill. App. 3d 116, 355 N.E.2d 607.) Absent an abuse of that discretion, the Board's determination will not be disturbed on review. *Marblehead Lime Co. v. Pollution Control Board* (1976), 42 Ill. App. 3d 116, 124, 355 N.E.2d 607.

 It is further established that the question of good faith, or the lack thereof, is pertinent to the determination of sanctions. (*Wasteland, Inc. v. Pollution Control Board* (1983), 118 Ill. App. 3d 1041, 456 N.E.2d 964.) Clearly, the record before us reveals a continuing lack of good faith on the part of Standard Scrap. For 10 years, the company demonstrated a blatant disregard for the requirements and procedures designed to protect the environment. Standard Scrap first failed to comply with the Board's 1974 order requiring the installation of an afterburner on its furnace. The order was based on a stipulation in which the partners of Standard Scrap specifically agreed to install the afterburner. As a result of its noncompliance with the order, the evidence shows that the company saved a substantial sum of money.

Standard Scrap's bad faith is further evidenced by the fact that it admittedly never had the required operating permits from the Agency for its furnace and incinerator, and that it failed to secure an operating permit for its boiler from February 1974 until April 1983. The record reveals that Standard Scrap not only knew of the permit requirements for its emission sources, but that it continued to operate without the permits and without taking sufficient steps to acquire them despite repeated notices and warnings from the Agency.

Contrary to Standard Scrap's contention, violation of the Act's permit requirements is not a mere "paper" or "minor" violation. Rather, the violation of a permit requirement goes directly to the heart of the State's enforcement program and ability to protect against environmental damage. The permit program is a method through which the State of Illinois can control emitters of contaminants into the atmosphere, as well as emissions that may result in the presence of contaminants in the environment. (See Currie, *Enforcement Under the Illinois Pollution Law* 70 Nw.L. Rev. 389, 476 (1976).) Once proof is submitted that construction and operation of a facility will not cause environmental damage, a permit is required to be issued by the Agency. (Ill. Rev. Stat. 1985, ch. 111½, par. 1039(a).) If a permit is denied by the Agency, an appeal may be filed with the Board. (Ill. Rev. Stat. 1985, ch. 111½, par. 1040.) Additionally, the Act provides that where a permit requirement imposes an arbitrary or unreasonable hardship, a party can seek and obtain a variance from the permit requirement. Ill. Rev. Stat. 1985, ch. 111½, par. 1035.

Here, despite having been afforded repeated opportunities and numerous offers of assistance from the Agency, Standard Scrap failed to bring its facility into compliance. Two of its emission sources still do not have permits, and the one permit it does have was not sought until *after* the instant complaint was filed. Nor did Standard Scrap ever appeal its permit denials or seek a variance from compliance.

■ In addition to the question of good faith, section 33(c) of the Act provides that the following factors are to be considered by the Agency in assessing sanctions:

"(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practicability and the economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source." Ill. Rev. Stat. 1985, ch. 111½, par. 1033(c).

Each of the above factors was given proper consideration in the Board's written opinion. With regard to the first factor, the Board correctly found that Standard Scrap's emissions endangered the public health and safety. The evidence revealed that while Standard Scrap is located in an area populated by much industry, there are numerous residences near the plant, some of which are located only 30 feet away. Additional evidence showed that voluminous smoke from Standard Scrap created a safety hazard for those using the Dan Ryan Expressway. Finally, there was testimony showing that smoke from the Standard Scrap plant caused workers at a neighboring company to become ill.

As to the second factor set forth in section 33(c), the social and economic value of the facility, it is undisputed that Standard Scrap provides social and economic value in that it employs individuals and serves the steel manufacturing industry. As the Board correctly observed, however, those communities are better served by a facility utilizing controlled emission sources. Similarly, while the evidence as to suitability of the facility indicated that the area is populated by heavy industry and therefore well suited to such a concern, this does not mean that the facility can be operated without proper pollution controls. As the Board aptly noted, while the operation may be suited to the area if properly operated, it is not so suited if it is operated with-

out controls.

The final consideration under section 33(c) is the technical practicability and economic reasonableness of reducing or eliminating the problems. Here, as the Board found, afterburners are technically reasonable methods of controlling sweat furnaces and incinerators. No evidence to the contrary has been presented by Standard Scrap. Rather, Standard Scrap argues only that for it, it poses a difficult financial burden to install and maintain equipment necessary to comply with the regulations.

The record shows, however, that while other business entities have foregone profits in order to purchase, install and maintain air pollution controls designed to lessen and prevent pollution, Standard Scrap has elected to spend its profit otherwise. For example, during Standard Scrap's taxable year ending October 31, 1980, out of Standard Scrap's total income of $630,149, $250,320 or 40% was paid out as compensation for its four officers. For its taxable year ending October 31, 1981, $222,980 out of a total income of $510,044 or 44% was so paid out, and for its taxable year ending October 31, 1982, out of a total income of $418,776, $216,680 or 52% was similarly paid out. Hence, the percentage of profits paid to its officers steadily increased, even though its income decreased.

If Standard Scrap does not now have funds to cover both penalty and compliance costs, as well as cease and desist operations until compliance is achieved, that hardship is self-imposed. The company should have taken the necessary steps to bring its facility into compliance when first notified by the Agency and at a time when sufficient funds were available to do so. Standard Scrap cannot now be allowed to pass off a necessary cost of doing business in this State, and one borne equally by competitors, by arguing that compliance with environmental laws will put it out of business. If that were the case, no business would ever be inclined to comply with Illinois' environmental requirements.

We observe that Standard Scrap relies on *City of Moline v. Pollution Control Board* (1985), 133 Ill. App. 3d 431, 478 N.E.2d 906. There, the Third District Appellate Court reversed a $90,000 penalty imposed by the Board on the city of Moline. That case fails to support Standard Scrap's position. First, the court in *Moline* considered the fact that the Agency's complaint was not filed until after the environmental problems complained of were substantially under control. Here, Standard Scrap has yet to bring its facility into compliance. Secondly, the court in *Moline* found it significant that the petitioner's actions were not wilful. The same conclusion certainly cannot be

reached in this case with regard to Standard Scrap. Additionally, the violations in *Moline* occurred for approximately three years, a much shorter period of time than in the present case. Lastly, the *Moline* court placed great emphasis on the fact that it was dealing with a municipal body, rather than a private entity such as Standard Scrap, and noted that the burden of the fine would have been borne by the taxpayers. 133 Ill. App. 3d 431, 434, 478 N.E.2d 906.

We believe that a case more analogous to the present case is *Wasteland, Inc. v. Pollution Control Board* (1983), 118 Ill. App. 3d 1041, 456 N.E.2d 964. There, as here, petitioner was charged with several statutory and rule violations, including operating its facility, a landfill, without an Agency-issued permit. In *Wasteland*, as here, operation of the facility continued over an extended period of time and in disregard to notices of violations from the Agency. There, as here, the violations posed a danger to the environment. Finally, in *Wasteland*, as in this case, the petitioner was a private party who reaped an economic benefit from violations. In upholding a $75,000 penalty imposed by the Board, the *Wasteland* court reasoned:

> "[T]he penalty serves the legislative purpose of aiding enforcement of the Act, for through penalties upon those who blatantly disregard applicable rules and regulations, others, who might consider cutting corners at the expense of the environment, are deterred." 118 Ill. App. 3d 1041, 1055, 456 N.E.2d 964.

Here, as in *Wasteland*, the fine imposed against Standard Scrap aids in the enforcement of the Act. We note that the Board, in determining the amount of the fine, took into account Standard Scrap's financial condition as a mitigating factor. Furthermore, while the Board ordered payment of the $30,000 fine within 90 days of the order, it also indicated in the order that it would consider an extended payment plan.

■ With regard to the cease and desist order, Standard Scrap has long been on notice of the Act's requirements and has chosen to ignore them. Under the Act, every person is required to secure an operating permit *before* operating its emission sources. (Ill. Rev. Stat. 1985, ch. 111½, par. 1009(b).) Standard Scrap has failed to establish any circumstances which would allow it a preference against other facilities and place it above the law. If the company had taken the permitting process seriously, it would not find itself in its present situation.

■ Standard Scrap argues there was no evidence to support the Board's finding that its incinerator was operated during the malfunc-

tion of its afterburner control equipment. This argument must fail. It is held that findings of the Pollution Control Board will not be disturbed unless they are against the manifest weight of the evidence. (*Marblehead Lime Co. v. Pollution Control Board* (1976), 42 Ill. App. 3d 116, 355 N.E.2d 607.) Here, photographs taken by Agency inspectors on July 16, 1980, depicted voluminous black smoke being emitted from Standard Scrap's incinerator for nearly half an hour, a substantial period of time. Ronald Kanter of Standard Scrap admitted that the smoke was caused because the incinerator's afterburner was not working at that time. Additional Agency photographs and reports submitted into evidence revealed that similar conditions existed on May 14, 1982. As a result, we find there was a sufficient basis for the Board to conclude that Standard Scrap operated its incinerator during afterburner malfunction.

Standard Scrap further contends it was error for the Board to rely on its 1974 order because the complaint filed in the instant proceedings did not charge that Standard Scrap violated an earlier order. We find no merit to this contention. At the hearing, the Agency sought to have the Board take judicial notice of its prior order as a matter in aggravation. The record before us discloses that the Board considered the 1974 order for that purpose and nothing more. Standard Scrap has pointed to nothing in the Board's opinion that indicates otherwise.

Standard Scrap also urges that the Board's reliance on the 1974 order was erroneous because the respondent in that order is a "different entity" from the instant respondent. Standard Scrap does not dispute, however, that the Sam Cohen in the prior order is the current president and director of Standard Scrap. It is further undisputed that the entity in the prior order was merely a partnership-control of the same facility which in 1972 was merged into the present corporate-control through a tax-free reorganization. Hence, the present entity is the successor-in-interest to the earlier entity. As such, the Board did not err in considering the 1974 order as an aggravating factor.

Next, Standard Scrap argues it was error for the Board to rely on James Levis' testimony that it saved $104,500 by failing to install an afterburner on its furnace in 1974, as required under the Board's 1974 order. Standard Scrap asserts that all this evidence may "prove is that the company would have gone bankrupt years ago had it not had such a savings." We believe that, to the contrary, it shows a substantial economic savings by Standard Scrap at the expense of the public health and welfare.

Standard Scrap additionally contends that the savings figure was based on theoretical figures and unsubstantiated costs. In particular, it notes first that Levis, in determining the savings calculation, used the $30,000 cost of an afterburner in 1983 and reduced it to $13,000 in 1974 dollars. Standard Scrap labels this testimony as "theoretical" because Levis did not ascertain what an afterburner would have actually cost in 1974. Levis, however, explained that it would have been difficult to obtain from vendors a 1974 cost figure. The $30,000 figure that he used was the lower of two cost estimates obtained by Standard Scrap from a vendor in July of 1983. If Standard Scrap had data indicating that the $13,000 figure was incorrect, it should have offered it into evidence.

Finally, Standard Scrap argues that Levis did not use the tax bracket that it was in during the relevant years, or the actual method of calculating depreciation used by Standard Scrap. As the Board noted, however, Levis did use the top rate over the last 10 years for corporate income (48%), and used seven years depreciation life, the minimum allowed in order to take the maximum investment tax credit. This, coupled with a 10% tax credit, represented the minimal of savings.

The foregoing objections raised by Standard Scrap serve only to indicate that the cost savings testified to by Levis was conservative. Moreover, we note that while the Board took into account the value of the delayed compliance, the fine imposed is substantially less than that value.

In conclusion, for nearly a decade Standard Scrap has exhibited a blatant disregard for the rules and procedures designed to protect the environment. Based on the evidence before us, we cannot conclude that any portion of the Board's order was improper. Accordingly, the order is affirmed in its entirety.

Affirmed.

O'CONNOR and CAMPBELL, JJ., concur.